2 WS 418
30 SC ²133

# ⸕ Ellet *against* Paxson.

The damages which may be recovered for the breach of a mere verbal contract to convey land, are not to the whole amount of the purchase money, as that would be to enforce specific performance.

The damages should only equal the loss sustained by non-fulfilment of the contract, which, in a suit by vendor against vendee for not accepting a deed for the land, may be the difference between the value of the property at the time of the refusal, and the sum agreed on as the price.

A testator directed his whole estate to be appraised and valued, and devised all his estate, real and personal, to his six children, adhering to subsequent conditions, in six equal parts as near as may be, share and share alike, as tenants in common, and to their heirs for ever. As to his son S., he directed he should receive the income of his share during life, and after his death to go to his three daughters, or the survivor, in fee simple — protesting against any sale or conveyance of the same, so as to injure the principal, or deprive them, &c. To his daughter M. he bequeathed a book, &c., and added, "I repeat it again, that all that I have willed to her of my real estate is to be handed down to her children in fee simple, as tenants in common, she only to enjoy the income during her life, under the penalty, if by any manner whatever a conveyance or sale for term or length of time should be made, then the income to be taken out of her hands, and be divided between her brothers and sisters, preserving the principal for her children, to be secured and taken care of after her death by guardians appointed by the Orphans' Court by no means related to them in any manner whatever—my daughter M. to have the management of the same during her life, but no other person. Then, in like manner, the portion that falls to my grand-children, S.'s three daughters, (after deducting a certain sum), is to be secured to them, S. enjoying the income. I forbid any charge being made by either S. or those who have the bringing up the children, so as to obtain a hold of the property, till after the death of my son S. and daughter M. shall not be allowed." *Held*, that M. had only an estate for life.

An Act of Assembly authorized a sale of real estate by a trustee to be appointed by the Orphans' Court, the court to prescribe the time, place, and manner of his sale. *Held*, that this contemplated a future sale and also a public sale, and that a private sale before the passage of the Act was invalid, notwithstanding it was approved of by the Orphans' Court.

The suit to enforce payment of the purchase money in such case, can only be brought by the trustee, and not in the name of the *cestui que trust*.

THIS was an action of *assumpsit* brought by Charles Ellet and Mary his wife, the said Mary suing by her next friend and trustee, Elijah Dallett, for the use of said Elijah, against Timothy Paxson, Thomas P. Cope, Joseph Roberts, William J. Duane, and John A. Barclay, executors, &c., of Stephen Girard, deceased.

This cause was tried at *Nisi Prius*, before Mr Justice Sergeant, and a verdict rendered for the plaintiffs in the sum of $6500. The defendants moved for a new trial.

The declaration stated that Stephen Girard desired to purchase

[Ellet v. Paxson.]

a lot and stable in Harmony court, and employed W. J. Duane to make the purchase; and $15,000 was offered for them to plaintiffs, who agreed to sell and he to buy for that sum.   But as Girard's agent said there were difficulties in the title, and that an Act of Assembly would be necessary to authorize the *said Mary* to *convey*, it was further agreed that the plaintiffs would and should sign all petitions, deeds, and documents which the said W. J. D. should *draw* and *prepare*, and request them to sign, execute, and deliver for purpose of making perfect title.   And that said G. would get all these things done at his own expense, and would draft and endeavour to procure the passage of the Act of Assembly, of such a one as he should deem necessary to vest the title clearly in Girard, and that G. should pay $15,000.   Mutual promises.   Averment that W. J. D.. in *part performance*, drew a petition for an Act of Assembly on the 1st of December 1831, made draft of Act, and plaintiffs, in part performance, signed the petition.   That Girard did not use diligence in procuring passage of the Act, but neglected to have it done, and omitted to use any endeavour to procure passage of the Act for an *unreasonable time*, in consequence of which delay no Act was obtained until 7th of May 1832, when an Act was passed, in the words of the draft sent up by Duane, authorizing the Orphans' Court to appoint a trustee for Mary Ellet, who should make sale of the lot and stables.   Girard died 26th of December 1831, leaving a will, appointing defendants executors, which was proved 31st of December 1831, when letters testamentary were granted.   After death of Girard, plaintiffs requested Mr Duane to proceed according to agreement, to procure appointment of a trustee according to Act of Assembly, and to procure a confirmation of the Act of Assembly.   Plaintiffs were always ready to sign all papers, but defendants would not prepare them. That plaintiffs, on 20th of February 1835, made application to the Court, who appointed Dallett trustee, and 18th of April confirmed the agreement and sale, and decreed that trustee should make a deed, in trust for the persons who might be entitled as heirs or devisees.   On the same day Dallett gave security, and on the 4th of June made a deed of the character ordered, which he tendered and demanded the $15,000.   But they refused to accept the deed or pay the money.   Averment that when the agreement was made the buildings were in a decayed state and unprofitable.   That reliance upon the agreement has prevented them from improving. And they have been deprived of the increased rent which such improvements would have produced, to the amount of $10,000, and have expended $1000 on the proceedings.

The second count set forth, that in consideration that the plaintiffs, at the request of the said Stephen, would agree to *convey to him, in fee simple, by a good and sufficient deed*, a certain other lot or piece of ground and stables thereon erected, situate on the north side of Harmony court, in Walnut Ward, in the city of

[Ellet v. Paxson.]

Philadelphia, the said Stephen promised the plaintiffs to pay them therefor the price or sum of $15,000 on their conveying the last mentioned lot and stables to him as aforesaid, in consideration whereof the plaintiffs did then and there agree to convey the same to him as aforesaid; and the plaintiffs in fact say, that afterwards, to wit, &c., they were able, ready, and willing to *convey the last mentioned lots and stables* to the said Stephen in fee simple, by a good and sufficient deed, whereof the said Stephen then and there had notice; but the said Stephen not regarding his last mentioned promise (although then and there requested, &c.), then and there discharged the plaintiffs from making such conveyance and refused to accept thereof, or to pay them the last mentioned sum of money or any part thereof.

The third count was the same, except that the consideration stated was that the plaintiffs would convey a satisfactory title, and offered to do so.

The fourth and fifth counts were in substance the same, stating the tender to be to the defendants as executors.

The defendants pleaded *non assumpsit,* with leave, &c.

The plaintiffs gave in evidence. 1. Deed. Tench Francis to Israel Israel. 2. The will of Israel Israel, containing, among others, the following clauses, which are all that are material:

" I give and bequeath my estate, real and personal, in manner and form following: after my just debts are paid, *which, at this time,* amount to about $10,000, for the payment of same, I appropriate $3000 due to me on mortgage, &c.

My will is, that the whole of my estate be appraised and valued by seven judicious and skilful judges, to be appointed by my executors, the valuation to be on all the parts separately, as divided by this my will; and as it has pleased God to leave me six children, viz., Samuel Israel, Mary Ellet, William Israel, Michael E. Israel, Hannah Israel, and James Hutchinson Israel:

Item: I give, devise, and bequeath the whole of my estate, real and personal, to the above named six children, adhering to the subsequent conditions, legacies, &c., in six equal parts, as near as may be, share and share alike, as tenants in common, and to their heirs for ever.

My son Samuel must be charged with $9000, or whatever remains due to my estate of the $9000, by crediting his share of the amount of the purchase money paid by Jacob Fitler, sheriff, in the purchase of the property mortgaged to me of the three-story house in Pine street, the house in Tenth street, with a small grass lot adjoining what is called his children's place in Penn Township, which lot I devise in fee simple to his three daughters exclusively, Lætitia, Arabella, and Susan Israel as tenants in common. In the above devise I make no charge of interest or rent, nor any other set-off than the principal sum of $9000, provided he brings no charge for taxes, ground rent, or any other

unknown to me at this time.   Whatever the amount of his share of my real estate falls to him, my will is, that he receive the income thereof during his natural life, after his death to go to his said three daughters, or the survivor, in fee simple, for and to their only and exclusive use, share and share alike, as tenants in common; and I by this my will protest against any sale or conveyance of the same, so as to injure the principal or deprive them of my intention; their guardian may bring this my will as a bar to any conveyance for term or time, except a rent lease for a short or a reasonable period, always having strict regard to paying taxes and keeping in good repair the premises.

My will is that my estate be divided, after a careful valuation of all, and every part separately appraised, according to the following division or delineation, viz.:

Item No. 1. That part of my Hamburgh land and tenement, barn, &c.

Item No. 2. Is all the remainder of land and buildings that is or may be between the upper line of No. 1 and the line that divides George Baker and my land on the north, &c.

Item No. 3. Is the place called Cherry Green, containing about 12 acres, with all the improvements, &c.

Item No. 4. Is all that three-story brick house and lot of ground situate on the north side of Walnut street between third and Fourth streets, bounded, &c.

Item No. 5. Is the livery stables in Harmony and Hudson's courts, including the carriage-house and brick buildings on Harmony street from the corner of said carriage-house till divided by the gable-end wall of the three-story house occupied as a tavern by —— Knight, &c.

Item. No. 6. Is contained in the remainder of the lot and improvements from the north-east corner of Fourth and Harmony streets, till it reaches the east end wall of the three story house now occupied as a tavern, &c.

Item. And as this division of my property is of course unequal, and for the purpose of equalizing the same as near as possible, my will is, that the undermentioned property be applied by my executors to remedy the same, viz. the house and two acres and ten perches of land in Passyunk township, &c. &c.

Item. I bequeath to Mary Ellet a book called the Life of Christ, by Wesley, in heroic poetry, with the bookcase, made by myself; also Josephus, with one-sixth part of my books.   I repeat it again, that all that I have willed to her of my real estate is to be handed down to her children in fee simple, as tenants in common, she only to enjoy the income during her life, under the penalty, if, by any manner whatever, a conveyance or sale for term or length of time should be made, then the income to be taken out of her hands, and be divided between her brothers and sisters, preserving the principal for her children, to be secured and taken care of after her

death, by guardians appointed by the Orphans' Court, by no means related to them in any manner whatever. My daughter Mary to have the management of the same during her life, but no other person. . ,

Item. In like manner, the portion that falls to my grand-children, Samuel Israel's three daughters, after deducting the sum of $9000 due to me as the mortgage specifies, and as I have in this my will delineated, is to be secured to them, Samuel enjoying the income. I forbid any charge being made by either Samuel, or those who have the bringing up the children, so as to obtain a hold of the property, till after the death of my son Samuel, and daughter Mary, shall not be allowed.

Item. It is my will and intention that when the aforesaid six divisions or shares of my real estate shall have been valued and appraised as aforesaid, that my daughter Mary Ellet shall first make her choice of said shares, my daughter Hannah shall have the second choice of said shares, and the remaining four shares shall be divided among my sons as they shall mutually agree among themselves."

The plaintiffs then gave in evidence the deed of partition among the children.

The plaintiffs then called William J. Duane as a witness. It being submitted to the court that he ought not to be allowed to be sworn as a witness, he being one of the executors and defendants, the judge reserved the point, and directed him to be sworn, when he testified as follows:

In 1831, I was authorized by Mr Girard to negotiate for the property in Harmony Court. He was anxious to buy the property, and requested me to endeavour to purchase it for him. He considered it a nuisance to his other property.

Cross-examined — The negotiation was followed by an inchoate, an incomplete bargain. There was to be a title. I have no re-membrance of having seen any papers but the will of Israel Israel; I may have seen others. Doubts arose in my mind from reading the will. I conversed with Mr and Mrs Ellet on the subject of these doubts, and suggested the propriety of removing the difficul-ties by an Act of Assembly. Mr and Mrs Ellet had no one, that I am aware of, to attend to that part of the business. I entered into it with a great deal of zeal, knowing Mr Girard's anxiety to have the property. It is highly possible that I volunteered my aid to Mr and Mrs Ellet to procure the Act of Assembly. I drew a petition to the legislature, with the participation of Mr and Mrs Ellet, and probably Mr Israel. A correspondence took place with Dr Burden, a member of the legislature. The petition was sent to him to present. Do not know if I sent it to him or if Mr Ellet did. Mrs Ellet suggested Dr Burden as the person to whom to send the petition.

My impression is that there was another doubt on the title be-

[Ellet v. Paxson.]

sides the one that was to be cured by the Act of Assembly. Mr Ellet was to get it removed by obtaining the consent of Samuel Israel's three daughters, who lived in Hayti. I can truly say that I acted as much the agent of the Ellets as of Mr Girard. If Mr Girard had lived, I should have persevered, and, I believe, have completed the bargain — the removal of difficulties, of course, contingent. In answer to a question of Mr Meredith (Mr Girard, on the receipt of a title satisfactory to him, was to pay $15,000), I had forgotten the price till I came into court this morning, I thought it was $13,000. I am now impressed with the belief that it was $15,000. I have no doubt of it. I have no remembrance of any thing in the fall before Mr Girard's death. After his death I was surprised when Mr Ellet called on me. I thought the whole thing had dropped on Mr Girard's death. I would not have accepted the property before Mr Girard's death, either for him or myself. I certainly expected that the difficulties would be removed. I was never authorized by Mr Girard to contract in his behalf to aid in removing the difficulties in the title. I was not authorized by Mr Girard to bind him to sign, execute and prepare documents, &c. necessary to complete title. I acted as much out of friendship for the Ellets as the agent of Mr Girard. I never contemplated that Mr Girard was to pay the expense of procuring the title, nor was I authorized by him so to stipulate.

He never authorized me to bind him by a contract to procure from the legislature the passage of the Act. It was a case in which, if ever right, a counsel should have been feed by both parties.

I think Mr Ellet went to Harrisburg himself. I was anxious to accomplish an object both for Mr Girard and the Ellets.

I did not inform Mr and Mrs Ellet that I was authorized by Mr Girard to endeavour to procure an Act of Assembly.

I could not have informed them of what did not exist. It is highly probable that I spoke to Mr Girard, and that he recommended me to assist them in procuring the Act; it was to be done by them, and not by him.

Re-examined — Mr Girard authorized me to negotiate for the purchase. The price was a subject of conversation; he received their demand, and then considered it, and finally agreed, that on the completion of a good title, when the difficulties were removed, he would pay them $15,000. Mr Girard said the price was enormous. Girard wanted to buy. I went to them; finally, he said, I will give it, if they can make a good title. I then saw the will. All further action, on my part, was as the friend of Ellets. I reported to Girard the price. He may have told me, Mr Duane, help these people; help these people to get the title. I drew the petition, and had correspondence with Dr Burden.

I reported to Mr Girard when they agreed to accept the price; he said, assist these people to get out of the difficulties of making

title. It is very probable that I forwarded the papers to Harrisburg, and also that I drew the bill; my impression is, that I drew the bill; I have no remembrance of taking any steps to procure the passage of the bill; I considered that the examination of title was left to me; but he would decide for himself in all cases, and did often decide on titles differing from me in opinion. I have already said he was satisfied with the price, if a good title could be made.

Michael E. Israel sworn. In the summer or fall of 1831, Mr Duane called on me as the agent and attorney of Mr Girard, and wished to know if the property in Harmony Court was for sale. I stated that I would write to Mr and Mrs Ellet, the owners, and ascertain their views. I did write, and received for answer that $18,000 was the price. I communicated this answer to Mr Duane, and said I thought there were impediments in the way of making title, and either verbally, or by exhibiting the will, showed him what the impediments were: he replied he thought they could be removed, but the price was beyond Mr Girard's views. I again wrote, begged Mr Ellet to fall in his price—he did so—named $16,000. Communicated with Mr Duane, stated he was authorized to give $15,000—(what follows, objected to at the time as out of the agency)—he would undertake to transact the entire business in regard to obtaining the title, by drafting a bill and memorial to the legislature, free of cost to Mr and Mrs Ellet—that they should be paid the nett sum of $15,000—desired me to write, and state that price as the ultimatum of Mr Girard, and request Mr and Mrs E. to come to the city, if they accepted those terms—I made this communication; Mrs E. came to town, and I went with her to Mr Duane's office—said she had come to negotiate with him about the purchase—Mr Duane again said, that he would undertake the entire business of completing the title—she consented, and requested Mr Duane to put the agreement in writing—he appeared engrossed in business; said he was in a hurry, it was unnecessary to enter into any writing with Mr Girard—his verbal engagements were as binding as his written ones, and that he was satisfied that Mrs Ellet's were also—saw the memorial and the bill in Mr Duane's hand-writing—they were handed to me to be forwarded to Bristol for signature, and were returned to him by me. The bill was passed in May 1832—he said Mr Girard was anxious to have the property; it was an eyesore, which he wished to remove.

The property was a two-story brick building, occupied as a stable; the buildings are 30 or perhaps 40 years old, in tolerable repair—the interior appears dilapidated—it rented, at the time of the agreement, at $600 to $650 per annum: by an expenditure of $10,000, it would be made to produce an annual income of $3000—I cannot speak of the market value.

Cross-examined—The impediments spoken of, were the restric-

[Ellet v. Paxson.]

tions in the will of my father—the one prohibiting Mrs E. from selling—there was no other, that I am aware of.

Re-examined—I do not recollect calling on Mr Duane after the passage of the Act. I tendered this deed in company with Mr Ellet: saw Messrs Paxson, Barclay, Duane, and Roberts, on the 17th of June 1835; Mr Ellet asked for the amount of the purchase money—they declined to pay the money or take the deed.

William J. Duane recalled — Mr Ellet called on me in the spring of 1832. I told him that Mr Girard was dead, and that all was at an end—he was to be the judge of the title—it had been a contingent arrangement altogether—it is all over now, I am very sorry for you. Mr Girard died 26th December 1831.

Thomas Mitchell affirmed. I am acquainted with this property —its intrinsic value is $10,000. If I owned the property, I would not sell for that—I would give $10,000: the value has not changed since 1831.

The plaintiffs produced the following Act of Assembly :—

"An Act to authorize the sale of certain real estate of Israel Israel, late of the city of Philadelphia, deceased.

SEC. 1. Be it enacted, &c. That upon the petition of Mary Ellet and her husband, Charles Ellet, to the Orphans' Court of the city and county of Philadelphia, the said court is hereby authorized to appoint a trustee, or trustees, to sell and convey all or any part of the share of .the real estate of Israel Israel, late of the said city, deceased, which was allotted to, and taken by, Mary Ellet, daughter of the said deceased, for her use for life, and for her children in fee: Provided, however, that before any sale shall be made, the Orphans' Court of the said city and county of Philadelphia shall prescribe the time, place, and manner, in which the said sale shall be made, and shall also prescribe such acts to be done by the said trustee, or trustees, as shall secure the safe and permanent investment of the funds arising from such sale, the payment of the income therefrom to the said Mary Ellet for life, and the payment and distribution of the principal, after the decease of the said Mary Ellet, to and among her children, and the issue of any deceased child or children, the latter to take only the parent's share: And provided, also, that before the deed or deeds for the same shall be valid, the security or investment of the moneys arising from the sale, and the sale itself, shall be submitted to and approved by the said court.

Approved, 7th of May, A. D. 1832."

The following proceedings of the Orphans' Court were read in evidence :—

*Philadelphia County, ss.*

Be it remembered, that at an Orphans' Court for said county, held on the 20th day of February, A. D. 1835, Charles Ellet and Mary Ellet presented a petition in the words following, viz:

[Ellet v. Paxson.]

" To the Orphans' Court for the city and county of Philadelphia,

The petition of Charles Ellet and Mary Ellet his wife, respectfully showeth: That Israel Israel, late of the city of Philadelphia, deceased, did, during his lifetime, viz. on the 2d day of October 1817, make his last will and testament in writing, and thereby devised that his real estate should be divided into six shares, or purparts, according to the number of his children; and that the said Mary Ellet should have the election or choice of said purparts, but that she should only have a life estate in her purpart, with remainder to her children in fee. That the said Mary Ellet, after the death of the said testator, accordingly made election of the purpart in said will designated as No. 5—being certain tenements in the city of Philadelphia, in said will particularly described. That a certain Act of the Legislature of the Commonwealth of Pennsylvania was passed on the 7th day of May 1832, by which it was provided that, upon the petition of Mary Ellet and her husband, Charles Ellet, to the Orphans' Court for the city and county of Philadelphia, said court were authorized to appoint a trustee, or trustees, to sell and convey all or any part of the share of the real estate of Israel Israel, late of the said city, deceased, which was allotted to, and taken by, the said Mary Ellet, daughter of the said deceased, for life and for her children in fee.

And your petitioners further show that a large part of said property consists of a livery-stable in Harmony Court, in the city of Philadelphia, and is tenantless and unproductive, and can only be made so by extensive improvements, which the said Mary Ellet, being only a tenant for life, has neither the right nor ability to do so. That her whole purpart consisting of contiguous buildings, can be most advantageously sold by being sold together.

Your petitioners therefore respectfully pray your Honourable Court to appoint a trustee or trustees to carry into effect the provisions of the Act of Assembly aforesaid, and they will ever pray, &c.

CHARLES ELLET.
MARY ELLET."

Annexed to which petition was the affidavit of Charles Ellet.

Whereupon the court made the following order, viz.: the court, in pursuance of the within petition, appoint Elijah Dallet trustee for the purposes prescribed by the within recited Act of Assembly. The time, place, and manner of sale, and all the other directions as to the security or investment of the fund to be produced by the sale, to be made upon a future application to the court.

And, at an Orphans' Court for the county aforesaid, held on the 18th day of April A. D. 1835, Charles Ellet, Mary Ellet, and Elijah Dallett, presented a petition in the words following, viz.:

To the Honourable the Judges of the Orphans' Court, in and for the city and county of Philadelphia:

[Ellet v. Paxson.]

The petition of Charles Ellet and Mary his wife, and Elijah Dallett, trustee of the estate of the said Mary, &c.

Respectfully showeth: That your petitioners, Charles and Mary Ellet, in the lifetime of the late Stephen Girard, made a contract with him (through W. J. Duane, Esq., his attorney), for the sale to him, clear of all encumbrance, of certain premises, situated on the east side of Hudson's Alley, and north side of Harmony Court, in the city of Philadelphia; containing in breadth on said court, 24 feet 9 inches by 123 feet more or less in length, for the price or sum of $15,000; the same premises being part of said Mary Ellet's share of the estate of Israel Israel deceased. That the title to be made by the said Charles and Mary Ellet being objected to on the part of Mr Girard, Mr Duane, as his agent, undertook to procure the passage of an Act of Assembly under which a title could be made; and a petition to the legislature was drawn by him, and accordingly signed by the said Charles and Mary Ellet, in consequence of which the Act of Assembly was passed, under which Elijah Dallett aforesaid has been appointed trustee by your Honourable Court.

Before the passage of the said Act, Mr Girard died. Said premises are subject to a yearly rent charge of $123\frac{50}{100}$, held by Charles Ellet. Your petitioners now pray your Honourable Court to approve of the said sale, and order the trustee aforesaid to make a deed of the premises to the executors of the said Stephen Girard in trust for the person or persons who may be entitled, as his heirs or devisees, to the said premises, and to receive the price or sum of $15,000 as aforesaid (less $2058\frac{33}{100}$, the principal of the said rent charge), from the said executors, and also that your Honourable Court will approve of Charles Ellet as security for the due investment and application of the said moneys by the said Elijah Dallett, when they shall be received by him as aforesaid. And your petitioners, &c.

CHARLES ELLET,<br>MARY ELLET,<br>ELIJAH DALLETT."

Whereupon the court granted the prayer of the petitioners, and made order accordingly.

And, at an Orphans' Court for the county aforesaid, held on the 3d day of June A. D. 1835, a bond was presented to the court, and ordered to be filed, in the words following, viz.:

" Know all men by these presents, that I, Charles Ellet, surety of Elijah Dallet, trustee of Mary Ellet, am held and firmly bound unto the Honourable Edward King, President Judge of the Orphans' Court for the city and county of Philadelphia, and his successors in office, in the sum of $30,000, to be paid unto the said obligee and his successors in office, to which payment, well and truly to be made, I do hereby bind myself, my heirs,

executors, administrators, and assigns, and every of them firmly by these presents, sealed with my seal, and dated the 3d day of June A. D. 1835.

The consideration of the above obligation is such, that if the above named Elijah Dallett, trustee of the estate of Mary Ellet, shall well and truly invest, apply, and account for the sum of $12,941.67, being the purchase money of said trust estate in Harmony Court, directed by order of the Orphans' Court for the city and county of Philadelphia, made on the 18th day of April, now last past, to be conveyed by the said trustee to the executors of Stephen Girard, or if the said purchase money shall not be paid by the said executors to the said trustee, then the above obligation to be void, or else to be and remain in full force and virtue.

(Signed)         CHARLES ELLET. [SEAL.]

Sealed and delivered }
in the presence of us. }
SAML. L. CLEMENT,
CHARLES C. CRESSON."

The plaintiffs then read, deed, Elijah Dallett, trustee; Charles Ellet and Mary his wife to William J. Duane and others, executors, &c.

Wm. J. Duane, re-examined—Mr Ellet called on me in the spring of 1832. I told him that Mr Girard was dead—don't know if he told me that he expected the contract would be fulfilled.

Cross-examined—The contract was made as I have represented it.

M. E. Israel, re-examined—I considered Mr Duane as the agent of Mr Girard; he urged Mrs Ellet to sell for $15,000, and that the expense of procuring the Act of Assembly would be $500, which Mr Girard was to pay.

Wm. J. Duane, re-examined—I never undertook for Mr Girard to complete the title. I did not see Mr Girard on the subject before the conversation in my office.

Mr Girard requested me to send the bill and petition to Harrisburg.

The plaintiffs here closed their testimony.

The defendants offered no testimony.

The learned Judge charged the jury as follows:

It now becomes your duty, under the instruction of the court, to decide upon the conflicting allegations in this somewhat complicated case, and to determine the amount of damages, if any, which are due to the plaintiffs.

The state of the law in Pennsylvania in relation to such contracts is somewhat peculiar.

In England parties have been prohibited by statute from acquiring title by, or sustaining actions upon mere verbal contracts for

the purchase and sale of real estate. And the reason is found in the danger and difficulty of relying on mere verbal testimony in so important a matter.

In Pennsylvania, too, you probably know from your own experience, that, as a general rule, no title to real estate passes by a mere contract, unless it is reduced to writing. We have an Act of Assembly which declares the law passed in 1772, which I now read to you. And, therefore, under a contract not in writing, the title does not pass.

But, although the contract be not in writing, and although the estate for that reason does not pass, may not the vendor have an action against the vendee for breach of this verbal contract? It has been decided that he may.

In the case under trial, the contract is merely a verbal one, and an action may be sustained for a breach of it. It is probable if Mr Girard had lived the contract would have been completed, but unforeseen circumstances have occurred, and the parties stand upon their rights. The executors of Mr Girard would not be justified in doing any thing which the law does not require.

The plaintiff then says he is entitled to a verdict for the agreed price of $15,000, or more, to be released on acceptance of the title and payment of the purchase money.

I do not agree to this. To do this would be to subvert that Act of Assembly; you might as well repeal it; and I therefore instruct you accordingly; I have no doubt upon this point.

Then the question recurs—if there has been a contract, and that broken, what damages is the injured party entitled to? The jury may give such damages as the circumstances of each case require, which may sometimes be small.

This very case shows the policy of the English rule; here, the witnesses called by the same party differ in their statement of facts. These facts it is your duty to examine; and in this examination the declaration must be kept in view.

The first count claims compensation for not getting an Act of Assembly passed, for not perfecting the title, &c., and finally for not accepting it.

The other counts are founded upon an agreement simply to purchase the estate; and they aver a good title in the plaintiff.

The first question for you is under the first count in that declaration, in which the plaintiff seeks to recover, independently of the question of title, upon allegations that the defendant undertook to procure the passage of an Act of Assembly, and to perfect the titles, &c.

The questions here are—

First. Did Mr Duane make such a contract as is set out in that count?

Second. If he did, was he the authorized agent of Mr Girard for that purpose, and to that extent?

[Ellet v. Paxson.]

Now, as I understand the evidence, he had no authority from Mr Girard to make such a contract. You must be satisfied he had such authority.

Did Mr Girard authorize Mr Duane to contract for him to perfect that title? Mr Duane says he did not. Nobody but Mr Duane speaks of this point. Upon this point he is uncontradicted. He is the plaintiff's witness, and if he does not make out their case, who does?

Secondly, suppose he did; was there any reasonable delay? upon this subject there is no evidence. And if there was, what expenses were incurred by the plaintiff? There is no evidence of any. I do not think this count is made out.

The main and true question in the cause is, was there a contract made by Mr Girard to pay $15,000 for this property on a good title being furnished him?

The defendants say there was no positive contract at all: on the one hand Mr Duane says there was not; Mr Israel, however, states the matter differently, and says there was a positive bargain. It is for you to decide whether there was a contract. People do not usually permit these things to rest on mere conversation when there is a positive contract. It is one thing to make a contract, and another to say I have got money, and if you can make a good title I will buy, &c. On the other hand there was the actual request made to reduce it to writing, which was not done for the reason given by Mr Duane. You must say whether there was a contract or not.

The matter went on; a bill was drawn probably by Mr Duane. It went forward to the legislature, and was passed. It is a private Act.

And here arises another question. The Act passes, and a deed is tendered; the plaintiffs certainly are bound to make a good title. Then was this a good title? I have not formed an opinion, nor am I going to express one. The will of Israel Israel is certainly a peculiar one and efforts to create unusual dispositions of property often beget difficulties. The real difficulty here results from the clause in which the testator directs that all he gives to her (Mrs Ellet) shall be handed down to her children in fee simple; and the penalty attached if she should dispose of the estate, that she shall lose the income. Then had she a right to sell it out and out?— that is the question. But I advise you in framing your verdict to take it that the title of the plaintiffs was good. That question will be considered in bank. I do not like the settlement of damages upon hypothetical cases, and should have preferred that this question of title had been previously settled in another mode; but I instruct you for the present purpose to consider the title good.

Then if you are of opinion that it was Mr Girard's bargain to pay $15,000 on receiving a title, and assuming that the title was

[Ellet v. Paxson.]

good, the next question is, was the contract broken? About this there can be no doubt. The very annunciation by Mr Duane that he considered it as at an end was a breach.

The question of damages remains. As to the $15,000, I am opposed to that; there may be some difficulty as to the proper measure. The amount of damages, I think, should be the *real loss*. Nothing is claimed here as vindictive or exemplary; the rule stated by the counsel for the plaintiff appears to me to be the true rule; the price agreed upon, deducting the market value. This property might have been put up at public sale, and the difference have been thus ascertained; but that was not done, and therefore, the actual value must be inquired into. Nor is it an answer to say that the party agreed to give more than it was worth. Give the sum, the difference between the value when the bargain was renounced, and the amount of the bargain.

As to the value, the evidence is not satisfactory. There are two witnesses; they differ very widely. Mr Mitchell says the value of that kind of property is capricious. Its intrinsic value he estimates at $10,000, but would not, if it were his, take that for it. Mr Israel, who knows all about the property, and has some interest in the matter, because he may be entitled to a part of the income, says, that by the expenditure of $10,000 on the property, it would produce an income which would make it worth $50,000. These are all the data you have.

As to the manner in which the suit is brought by the parties plaintiffs, and as to the alleged waiver and abandonment of the contract, I am, for the present, against the defendants; but, if you think the lapse of time an answer, and that the contract was waived by Mr Ellet, you may so find.

Reasons for a new trial:

1. The action was upon an alleged breach of contract, said to have been made by the testator, and not in writing, for the purchase of certain real estate in Harmony Court, from the plaintiffs. The learned Judge who tried the cause, charged the jury to consider the title of the plaintiffs to the premises which were the subject of the alleged contract, as perfectly good, and to give a verdict upon that assumption, when, in point of fact, their title was not a good title, nor such a title as the defendants or their testator were bound to accept. (The learned Judge considered this question as one fit only to be discussed before the court in bank, and intended, by this direction, to reserve it.)

2. Because the learned Judge ruled that the action was well brought by the husband and wife.

3. Because the learned Judge charged that there was not sufficient evidence to presume a waiver and abandonment of the contract.

4. Because the facts given in evidence do not support the ver-

[Ellet v. Paxson.]

dict, and upon the evidence the plaintiffs are not, in point of law, entitled to recover.

5. Because the verdict is against the evidence in this; — that there was no proof of a contract. That there was no proof of such a contract as was declared upon. That there was no proof of sufficient agency.

That there was sufficient evidence that the contract (if any) was waived and abandoned by both the supposed contracting parties.

That the deed proved to have been tendered, was not made or tendered to the proper persons.

6. Because the verdict was against the charge of the court.

7. Because the damages are excessive.

8. Because the learned Judge ruled that William J. Duane, Esq., one of the defendants, could not decline to be examined as a witness. The Judge directed him to be sworn reserving the point.

9. Because the learned Judge permitted M. E. Israel to give evidence of a contract said to have been made through the medium of an agent of the testator; exceeding the powers of that agent, as previously proved.

*Olmsted* and *J. M. Scott*, for the defendants, contended:

1. That the title was defective; Mrs Ellet having only a life-estate, and not being capable of conveying in fee simple, as was apparent from the intention of the testator, and the legal construction of the devise to her, and the restraint on her conveying. 8 *Watts* 186; 2 *Shep. Touch.* 452; 1 *Pow. Dev.* 353; 2 *Vez.* 276; 3 *Dow.* 61; 2 *Mass. Rep.* 56; 10 *Serg. & Rawle* 298; 2 *Mass. Rep.* 554; 2 *Pow. Dev.* 162; 3 *Whart.* 305.

2. Mrs Ellet could not contract for the sale of her estate, and can not maintain this action. 2 *Kent's Com.* 168; 6 *Wend.* 10; 6 *N. Hamp. Rep.* 17; 17 *Mass. Rep.* 291; 9 *Mass. Rep.* 172; 5 *Day* 492; 15 *Johns.* 483; 7 *Johns.* 167; 1 *Rawle* 231.

3. The Act of Assembly passed in this case has not been pursued or regarded at all. It provides only for a future sale to be made of the property, and does not purport to confirm the contract previously made.

*Meredith, contra,* argued that Mrs Ellet took an estate tail by the devise to her children. *Moore* 397; 17 *Dow.* 321, 431; 2 *B. & P.* 485; 1 *East* 259.

2. That the action was well brought, as a wife may join her husband in a contract made after marriage, provided she is the meritorious cause of action. 10 *Serg. & Rawle* 208; 6 *Serg. & Rawle* 466; 14 *Serg. & Rawle* 379; 7 *Watts* 113; 6 *Watts* 301; 8 *Watts* 412; 33 *E. C. L.* 76.

3. Mrs Ellet having an inheritance, could convey with or without an Act of Assembly. Her deed bars the entail, if it was one.

[Ellet v. Paxson.]

The opinion of the Court was delivered by

KENNEDY, J.—This is an action of *assumpsit*, claimed to be founded upon a verbal contract, alleged to have been made by Stephen Girard, the testator, in his lifetime, with the plaintiffs, for the purchase of a certain lot or piece of ground, and stables thereon erected, situate on the north side of Harmony Court, in Walnut ward, in the city of Philadelphia, at the price of $15,000. On the trial of the cause, at *Nisi Prius*, various questions were raised, which are presented in the reasons assigned for a new trial. Among the number, the question whether the plaintiffs tendered such a title to the defendants as they were bound to accept under the contract alleged to have been made with their testator, was perhaps the most difficult, and not the least important. It was not deliberately passed on, but, for the purpose of disposing of all the other questions, the jury were instructed to consider the title good: that if it were not so, and the jury should be of an opinion that the contract for the purchase was established, and that the testator, in his lifetime, or the defendants, since his death, had failed to comply with it, so that their verdict should be for the plaintiffs, the defendants would be entitled to relief by having the question as to the title decided in bank. And seeing the court in bank are of opinion, after full consideration, that the title offered by the plaintiffs to the defendants is not such, supposing the contract for the purchase to have been made, as the defendants ought to have accepted, it becomes unnecessary to pass upon the other questions. I cannot, however, forbear expressing my opinion as to the insufficiency of the evidence given to establish the contract, as set out in the declaration, or, indeed, to show that any definitive contract at all was made for the purchase. Viewed in its most favourable aspect for the plaintiffs, it appears at best to be but very loose and unsatisfactory. The damages assessed by the jury, also appear to be enormous, and altogether unreasonable. It is true, to be sure, that the action was brought to recover the whole amount of purchase money, which exceeded greatly the amount of the verdict; but as a recovery of the purchase money would have been, in effect, an enforcement of a specific performance of the contract, the learned Judge before whom the trial was had, very properly ruled, that as the contract declared on was verbal, and therefore within the provisions of the Act against frauds and perjuries, the plaintiffs at most were only entitled to recover damages equal to the loss actually sustained by a non-fulfilment of the contract; which, in this case, would appear, from the evidence, to be the difference between the value of the property, at the time the defendants refused to fulfil the contract, and the sum agreed to be paid as the price of it. But it does seem to me that the jury went beyond this; which, according to the evidence, did not exceed, at the utmost, the sum

[Ellet v. Paxson.]

of $5000; but they have given their verdict for $6500. Let us, however, return to the question of title. By the plaintiffs' counsel it has been argued, first, that the wife of the plaintiff took an estate tail in the property in question, under the will of her late father; and that the deed of conveyance, therefore, offered to the defendants, if it had been accepted by them, would have passed the fee simple in the property. That she took an estate tail, and not an estate for life merely, is, as it has been contended, shown by the doctrine established and laid down in *Wild's case* (6 *Co.* 17), as also the cases of *Davie* v. *Stevens, (Doug.* 321); *Hodges* v. *Middleton, (Id.* 431); *Seale* v. *Barter,* (2 *Bos. & Pull.* 485); and *Wood and wife* v. *Baron,* (1 *East.* 259). But the farthest that the doctrine laid down in *Wild's case* goes, is that where A devises his lands to B, and his children or issues, and he hath not any issue at the time of the devise, it shall be considered an estate tail. But where B has children or issue, at the time of the devise, they shall take, jointly with their father, an estate for life; or if the devise be to him *for life,* and *after his decease* to his children, the father in this case will only take an estate for life, and his children, whether born or not at the time of the devise, will take as purchasers by way of remainder. And the case of Wild itself was that of a devise "to Wild and his wife, and *after their decease* to their children;" and resolved that Wild and his wife had but an estate for life, with remainder to their children. Hence, it appears to me that *Wild's case,* as also every thing contained in it, is most decisively in favour of the plaintiff's wife taking but a life estate under the will of her father; for, by the terms of the devise, the testator expressly limits the duration of her interest to that of her life, and shows plainly also that her children are not to take until after her death, when they are to take a "fee simple as tenants-in-common," which must necessarily be by way of remainder; and whether she had children or not at the time of making the will, which does not distinctly appear, though the inference to be drawn from the terms of the will would seem to be that she had, the remainder is good, because the life estate to the mother is sufficient to support it either as a vested or contingent remainder.

The words of the testator in relation to the devise in question, are, " I repeat it again, that all that I have willed to her (meaning his daughter Mary, the wife of the plaintiff) of *my real estate* is to be *handed down* to *her children* in fee simple, as *tenants in common,* she *only* to enjoy the *income during her life,* under the penalty, if by any manner a conveyance or sale for term or length of time should be made, then the *income* to be taken out of her hands, and be divided between her brothers and sisters, preserving the *principal* for her children, to be secured and taken care of after her death by guardians appointed by the Orphans' Court, by no means related to them in any manner whatever. My

daughter Mary to have the management of the same during her life, but no other person." The testator, when he says, "I repeat it again," was clearly under the impression that that portion of his real estate, given by him in a previous part of his will to his daughter Mary, had been given to her for her life only, but in this he was mistaken; yet it goes to show most conclusively the fixed determination of his mind from first to last, that Mary, the wife of the plaintiff, should only have a life estate in it. Under the previous part of the will, Mary would have taken a fee simple in her portion of the real estate. The words are, "I give, devise, and bequeath the whole of my estate, real and personal, to the above named six children (among whom Mary is one); adhering to the subsequent conditions, legacies, &c.; in six equal parts, as near as may be, share and share alike, as tenants in common, and *to their heirs for ever.*' But then the effect of this is qualified and restrained, indeed nullified it may be said, as regards the *quantum* of the estate given to Mary, by the subsequent clause, recited above, reducing her interest expressly to a life estate. It is said that the words, "to be handed down to her children," show that the testator intended that that portion of the real estate, allotted by him to Mary, should *descend* from her, as by *operation of law* to her children; and if so, she must be considered as invested with an estate tail under the will. But the words immediately following, "in fee simple, as tenants in common," are wholly incompatible with such estate, or the requisite operation of law to create it. And the words immediately following these last recited, "she (meaning Mary) only to enjoy the income during her life," are wholly incompatible with such intention as that of giving an estate tail or any other estate to Mary, than that for life.

But it is contended that the remaining words of the same item in the will, go to show that even if Mary should sell and convey her portion of the estate, the testator did not mean that such sale and conveyance, though in fee, should be void. But that, for doing so, she should forfeit all her right to claim any benefit from the proceeds thereof. The remaining words are, "under the penalty, if by any manner whatever a conveyance or sale for term or length of time should be made, then the *income* to be taken *out of her hands,* and be divided between her brothers and sisters, preserving the PRINCI-PAL for her children, to be secured and taken care of after her death, by guardians appointed by the Orphans' Court, by no means related to them in any manner whatever. My daughter Mary to have the management of the same during her life, but no other person." The word "*principal*" here, it is said, must be understood to mean *money,* that is, the money that shall arise from the sale and conveyance made by Mary of her portion; because *principal* is not referrible, properly speaking, to land or real estate; but certainly, land or real estate may be called *principal,* when it is

intended to distinguish it from the profits or income that may be derived from it, with as much propriety as the interest that arises from a *pecuniary* principal may be called *income;* so that the argument has nothing conclusive in it, going to show that it was the intention of the testator that a sale and conveyance of the estate by his daughter Mary should not be void. But on the contrary, the whole of the item or paragraph taken together, shows very clearly that the testator intended that she should only have a life estate at most, and, as if he was not even willing that she should sell and convey that away, or if she did that she should forfeit all claim to the income of it thereafter, and that it should be taken by her brothers and sisters during her life, and upon her death go to her children with the estate itself in fee-simple, to be enjoyed by them as tenants in common. There is nothing in this case which would seem to indicate that the testator intended to use the term " children" as one of *limitation* but not of *purchase.* Had he superadded to the devise a clause providing that, in case of Mary's dying without children, then, or in that case, the estate should go over to others named by him, there might, perhaps, have been some colour for saying that *children* ought to be construed as a word of limitation, seeing such a clause would have tended to show that the testator meant *issue* by the word children, and that the estate should descend to his issue indefinitely, and not go over as directed, except upon an indefinite failure of issue. Had such a clause been introduced, the other cases cited, beside that of Wild's, by the counsel for the plaintiffs, might possibly have had some bearing upon this case; but as it is, we cannot perceive that they make any thing in favour of the plaintiffs.

But it is alleged in the second place, that the deed of conveyance, tendered to the defendants by the plaintiffs, carried with it a good title to the estate in fee, under the Act of Assembly passed, as it is said, in this behalf, the 7th of May 1832. By this Act, upon the petition of Mary Ellet and her husband, Charles Ellet, the plaintiffs, to the Orphans' Court of the city and county of Philadelphia, the said court is authorized to appoint a trustee or trustees to sell and convey all or any part of the share of the real estate of Israel Israel, late of the said city deceased, which was allotted to and taken by Mary Ellet, daughter of the said deceased, for her use for life, and for her children in fee. But before any sale shall be made, the court shall prescribe the *time, place,* and *manner* in which the said sale shall be made, and shall also prescribe such acts to be done by the trustee or trustees, as shall secure the safe and permanent investment of the funds arising from such sale, the payment of the income therefrom to the said Mary Ellet for life, and the payment and distribution of the principal, after her decease, to and among her children, and the issue of any deceased child or children, the latter to take only a parent's share. And

[Ellet v. Paxson.]

that, before the deed or deeds for the same shall be valid, the security or investment of the moneys arising from the sale, and the sale itself, shall be submitted to and approved by the said court. Now, it is very apparent from the terms of the Act, that the sale spoken of and authorized by it, was a future sale to be made by the trustee or trustees appointed for that purpose by the Orphans' Court, under the authority of the Act; and it would seem also that a public sale was intended, as the court is required to prescribe the *time, place, and manner,* which would have been unnecessary, had a private sale been contemplated. But the sale which is alleged to have been made, and sought to be enforced here, is a *private* sale, made by the *plaintiffs before* the passage of the Act, and therefore cannot be brought within the terms of it, or considered as sanctioned by it. It is said, however, that the sale alleged to have been made in this case, was approved by the Orphans' Court; but seeing it was not made in pursuance of the terms of the Act, the Orphans' Court had no power to approve or confirm it. Had a sale been made in pursuance of the Act, it and the conveyance could only have been made by the trustee appointed by the Orphans' Court for that purpose, and in case of a refusal on the part of the buyer to pay the purchase money, the suit to enforce the payment thereof could only have been instituted and prosecuted in the name of the trustee; so that the whole proceeding would have been altogether different from what it is in this case. We are therefore of opinion that the verdict must be set aside, and a new trial granted.

New trial granted.