## Hertzog *versus* Hertzog's Administrator.

In an action for the breach of a parol contract for the conveyance of land, in consideration of money paid and services rendered, the damages are to be measured by the amount of the consideration, and not by the value of the land. The plaintiff cannot recover damages for the loss of the bargain.

Jack *v.* McKee, 9 *Barr* 235, and kindred cases, overruled.

ERROR to the Common Pleas of *Fayette county.*

This was an action of *assumpsit* by John Hertzog against George W. Hertzog, administrator of George Hertzog, deceased, for services rendered and money paid by the plaintiff to the defendant's intestate, on account of the purchase of a tract of land, known as the Drown Farm. The case was formerly before this court, and is reported in 5 *Casey* 465.

On the trial, the plaintiff gave evidence that his father, George Hertzog, the defendant's intestate, had purchased the Drown Farm for him, he undertaking to pay the purchase-money; and that he had paid to his father a portion of the purchase-money, partly in cash, and partly in services. And he claimed to recover the value of the land with interest, less the amount of the balance of unpaid purchase-money.

The court below (GILMORE, P. J.) charged the jury as follows:—
"The principal point which the plaintiff makes is this, that his father George Hertzog, at his instance, became the purchaser of the Dr. Drown tract of land for him, he undertaking and agreeing to pay the purchase-money; that he did provide a considerable portion of the means to pay for the land, but, inasmuch as he failed to pay the whole, his father, as trustee, held the purchase in his own name, and died without executing the trust; that the plaintiff then decided not to require from the executor the execution of the trust, but allowed it to be treated as a part of the estate of his father, and to be portioned among his heirs, and under this state of facts, he is entitled to recover the value of the tract at the time of the death of his father, deducting therefrom what has been paid by his father. We are of opinion, that a recovery cannot be had upon this basis. The plaintiff cannot turn round on his heel, and say to the trustee, I find I am unable to pay all I promised you to pay, but keep the land, pay me its full value, and I will allow you what you have paid. The most he can be entitled to, where there has been a failure of this kind, or where the trust had been mutually abrogated, would be, if the trustee keeps the property, to require him to pay what had been contributed by the *cestui que trust.*

"We, therefore, charge you that, in any aspect of the case, the

measure of the recovery here will not be the value of the land, less the amount paid towards the perfection of the purchase by old George Hertzog.

"Under this ruling, therefore, it is not important that the plaintiff should be able to satisfy you from the evidence of Bowman and Stumm, and others, that this was the arrangement in reference to the purchase of the land. We are inclined to believe from the evidence, principally the declarations of old Mr. Hertzog, as proved by plaintiff, that whatever the arrangement was, it was to be perfected by his last will and testament.

"If the jury should be satisfied from this, that the old man declared his intention to bequeath this land to John, and held this as an inducement for him to contribute to the acquisition of the estate, and he did so, and he afterwards disappointed the hopes of the expectant devisee, by dying without any testamentary disposition of his property, then we say to you, that the plaintiff is entitled to recover from the estate of the defendant, any amount which he can show was contributed towards the purchase, with interest from the death of the defendant."

To this charge the plaintiff excepted; and a verdict and judgment having been rendered in his favour for $1208, he removed the cause to this court, and here assigned the same for error.

*Miller & Patterson*, for the plaintiff in error, cited and relied upon the cases of Jack v. McKee. 9 *Barr* 235; and Bash v. Bash, *Id.* 160.

*Fuller & Oliphant*, for the defendant in error.

The opinion of the court was delivered by

WOODWARD, J.—The omission from our statute of frauds and perjuries, of the 4th section of the British statute, after which ours was modelled, left us free to sue on parol contracts for the sale of lands. But such actions were rare in the early history of our jurisprudence; and when they were brought, the measure of damages, though not very distinctly defined in the cases, was so controlled, that specific performance of the contract should not be virtually enforced. It is too manifest for debate, that if the value of the land may be recovered in an action of case upon the parol contract, the statute, as we have it, is as effectually evaded, as if the land itself were recovered in ejectment. Therefore it was, that whilst the personal action was sustained, because forbidden by nothing in our statute, the damages recovered were measured by other standards than the value of the land at the time of the recovery. In some of the early cases, it would seem, the damages were merely nominal; in none, were they more than compensatory of what had been paid on the footing of the contract.

[Hertzog *v.* Hertzog's Administrator.]

The rule was indemnity—compensation for what had been paid or done—restoration of the parties to their condition before the contract was made. And this rule was agreeable to that which prevailed in England and Pennsylvania, in respect to breach of written executory contracts, and that also which was always applied to covenants of seisin, covenants for quiet enjoyment, and covenants against encumbrances, and for further assurance, in deeds of conveyance, or other executed contracts. Where there was no fraud, misrepresentation, or wrongful suppression of facts on the part of the vendor, but he was simply unable to convey the title stipulated for, or to defend his alienee in the possession granted, he was liable to restore the purchase-money received with interest, but not to compensate the vendee for improvements made, or for accretions, from any cause, in the value of the estate. In a word, the measure of damages for breach of real contracts was to be looked for, not in the value of the estate at the time of breach or eviction, but in the consideration which had passed between the contracting parties.

At length, cases began to make their appearance, in which land was promised, not for moneys paid, but for services rendered and to be rendered during the life of the promissor—such as a housekeeper usually renders to the employer, or a child to a parent. The quantum of services stipulated for in such cases, being necessarily uncertain, their value could not be ascertained beforehand. And as the parties had fixed their value by bargaining for a particular piece of land, when the action came for breach of the contract, it was argued, that nothing but the full value of that particular piece of land could indemnify the disappointed vendee. This class of contracts, though resting in parol, was regarded as so peculiarly meritorious, that the ordinary rule of compensation was departed from, and another adopted which had no precedent or analogies in the law of vendor and vendee. The value of the land, at the time of eviction or breach of promise, was held to be the measure. No attention was paid to the intrinsic and essential value of the services rendered, and none to the statute of frauds and perjuries. The case of Jack *v.* McKee, 9 *Barr* 235, was the first of this type that made its appearance in our books. It was followed by Bash *v.* Bash, *Id.* 260; by Oyer *v.* McDowell, 9 *Harris* 417; by Beach *v.* McClintock (not reported), and by Malaun *v.* Ammon, 1 *Grant's Cases* 123.

When the elective judiciary came in, the two cases in 9 *Barr* had been decided—the other three were decided by the new bench—but by a bare majority. In each of those three cases, Judge LOWRIE and myself, notwithstanding the unfeigned deference felt for our predecessors and our brethren, were constrained, by our sense of duty, to record our dissent, and in the last-named case, I expressed, in a written opinion, the grounds of our

[Hertzog v. Hertzog's Administrator.]

dissent. This opinion is reported in 1 *Grant's Cases*, beginning on page 132.

Since that opinion was written, we have had no cases of the kind in this court until the present term, and meanwhile the three judges who maintained the doctrine of Jack v. McKee, have withdrawn from the court, and the people of Pennsylvania have put other three judges on the bench, who, after full consideration of the subject, have, with one voice, instructed me to overrule Jack v. McKee, and all its sequents. Of course, the present Chief Justice and I concur with our brethren in considering those cases mistakes,- and the bench is now, therefore, unanimous in setting them aside.

It is to be expected, that when so grave a responsibility is assumed, the grounds and reasons of our action should be stated. These will be found fully developed in the dissenting opinion above mentioned. The authorities are also sufficiently referred to and discussed therein. The court does not mean to adopt or approve of all the observations in that opinion, but the legal positions assumed are believed to be well supported by the most approved authorities, and to be consistent with the general understanding of the profession in Pennsylvania, except for the period of ten years that Jack v. McKee ruled the law.

The main position of Judge ROGERS in that case, that the services being uncertain, both in quantity and value, can only be compensated by conveyance of the land agreed for, or by assessing its value, is, we think, a manifest error. The question is always brought under discussion, after the services have been rendered, and when they are therefore capable of exact description. However uncertain they may be, when agreed for, they are never uncertain as matter of judicial investigation, for they are past and known. Now that a jury is competent to assess the value of past services is proved by every day's experience in court. That they are as competent to perform this duty as to assess the value of land, will scarcely be denied. Why, then, it may be asked, should this class of cases be taken out of the general rule, that applies to other contracts for land both executory and executed? Why should the investigation be directed to the *value of the bargain*, in direct contravention of the rule in written contracts, instead of being directed to the *consideration of the bargain*, as in those cases? And why should there be virtual performance of a parol contract for land, the consideration being services performed, when we will not enforce performance, either actual or virtual, of parol contracts, the consideration of which has been paid in money?

These questions are not answered to our satisfaction by any of the cases mentioned. Nor do the authorities, cited by Judge ROGERS, justify the distinction which he introduced in Jack v.

[Hertzog *v.* Hertzog's Administrator.]

McKee. I will not go over them again, for they are sufficiently, discussed in the opinion in *Grant's Cases*, but I refer to the remarks in Davis *v.* Smith, 5 *Georgia R.* 285, as meeting the equitable views that are sometimes set up in favour of disappointed vendees. The observations of Mr. Rawle on pages 328–9–30–31 and 32 of his valuable treatise on Covenants for Title, are also worthy of especial notice as bearing on the same point. See also, Bitner *v.* Brough, 1 *Jones* 127.

Another reason, and an all-sufficient one, for overruling Jack *v.* McKee, is found in the effects and consequences of the principle there, for the first time, introduced into our law.

Whenever a departure from settled principles is shown by actual experience to have worked perniciously, to have occasioned wrong and hardship that were not anticipated, and to have placed the inheritance of families at the mercy of parol evidence, we think it the imperative duty of the court that made the departure, to undo the mischief as far as possible, and to retrace their steps back to the old paths. The disastrous effects of Jack *v.* McKee were fully shown in the subsequent cases of Beach *v.* McClintock, and Malaun *v.* Ammon. In Beach's case a grandson, whose services, as claimed by himself, did not exceed in value $1800, was permitted to recover a judgment against the administrator of his grandfather for nearly $10,000, which swept the fairest portion of old Nathan Beach's estate from his right heirs. In Malaun's case the entire estate of the decedent, real and personal, was taken from the heir-at-law, and given to a woman whose services, had they been the subject of compensation, would probably have taken but a very small portion of the estate, if indeed any of it, in addition to what had already been given her by her benefactress.

These were monstrous cases, but they were thought to be, and they were, necessary sacrifices to the principle of Jack *v.* McKee. We are not willing that that principle shall be maintained at such a cost. It had no foundation in law, as has been abundantly shown; and, instead of being called for by any public policy, experience, which is the best of all teachers, condemns it, and demands that it be expunged from the law of Pennsylvania. It is right to say, however, that we do not overrule Bash *v.* Bash; for though the judge who delivered the opinion seemed to sanction the rule of Judge ROGERS, the judgment of the court was rested on other grounds, which we do not mean to question.

In the case before us, there was a promise of land, in consideration of services and moneys paid. The learned judge disregarded the series of cases from Jack *v.* McKee down to Malaun *v.* Ammon, and laid down the old familiar rule in respect to the measure of damages. Herein he did right.

The judgment is accordingly affirmed.

The following is the opinion in Malaun's Administrator v. Ammon, above referred to, which although, when delivered, the opinion but of a minority of the judges, may now be considered the settled law of the state, having been unanimously decided by the entire court.

WOODWARD, J.—It was in the year of our Lord one thousand eight hundred and forty-eight, that the cases of Jack v. McKee, 9 *Barr* 235, and Bash v. Bash, *Id.* 260, were decided in the Supreme Court of Pennsylvania. Both these cases came up from Westmoreland county, and were reviewed and decided here at the same term. Conceiving that a very dangerous doctrine was, for the first time, advanced in these cases, on the measure of damages for breach of parol contracts for the sale of lands, which has already led to cases of monstrous hardship, and is liable to do much more mischief, I propose, first, to state the point ruled in these cases, then, to examine it in the light of reason and authority, and then, to point out its fruits in subsequent cases, this one now before us among others.

The pleadings in Jack v. McKee are not given in the report of the case, but it appears to have been an action on the case by Miss Ann McKee against the executor of Matthew Jack, on a contract, that in consideration of the plaintiff continuing to live with him, and take care of his house till he died, he would give her a certain piece of land. The contract was left in parol, and depended, so far as the land was concerned, on the uncorroborated testimony of a single female witness. Unconscious of any claim to his land, Jack devised it to his brother, and died. Several witnesses spoke of Jack's promises to compensate Ann's services, but Elizabeth McGarr was the only witness who proved a contract to give the *land*. Whether her testimony was direct and positive, or only inferential, I have no means of knowing, as it is not furnished; but there was a paper in evidence (the only written evidence), which tended strongly to contradict her. What she testified to must have been heard not later than May 1842, for she stated, that she had not been in the testator's house after that date. The paper referred to was a sealed note of Matthew Jack, dated the 17th September 1842, acknowledging himself indebted to Miss Ann McKee in $288, "exclusive of former notes," and expressly stated to be "on final settlement." The judge instructed the jury, that the measure of damages for the special contract, if proved, was the value of the land, and referred it to them to find whether her services were embraced in the settlement of September 1842. They found in her favour, and gave her the value of the land in damages, which ruling the Supreme Court affirmed, in an opinion delivered by Mr. Justice ROGERS.

[Hertzog *v.* Hertzog's Administrator.]

At the same term, but subsequently, Bash *v.* Bash came before this court. This also was an action on a parol contract to compensate the services of a son by the gift of a specific farm. The judge had held, that evidence to establish a contract between father and son, need not be stronger than between strangers, and that if it was "clear and satisfactory," it need not be "direct and positive." Chief Justice GIBSON, taking the rule as to the measure of damages from Judge ROGERS, in Jack *v.* McKee, without examination, proceeded to reverse the judgment, on the ground that the evidence in such cases should be direct and positive, and that there was no such proof in the case. By direct and positive proof, I understand, the testimony of a witness who was present when the bargain was made, and heard the parties contract, as contradistinguished from those casual allusions to it, and those testamentary purposes and intentions, which witnesses often hear one of the parties express in the absence of the other. Now, besides a good deal of this latter kind of evidence, in Bash *v.* Bash, one witness stated, that he was present when the parties, father and son, were at work on the farm, and he heard the son say: "We have more hard work than we are able to get through with." His father replied: "Don't be discouraged—you shall be paid for all the hard work you do for me—*I will leave you this place*— I hope you will live to see the day you will enjoy it." I doubt, if there was any evidence in Jack *v.* McKee, more *direct and positive* than this; and yet this, in connection with distinct admissions and corroborating circumstances, was held, by at least a moiety of the court, as insufficient in Bash *v.* Bash, whilst Elizabeth McGarr's uncorroborated and contradicted testimony was held sufficient in Jack *v.* McKee.

The plaintiff, in Bash *v.* Bash, was properly turned out of court, and the rule as to the measure of damages became unimportant, in the view taken of the evidence by the Chief Justice. This was probably the reason why he took the rule from Judge ROGERS, without sifting it, for I have found no case in which he seems to have vindicated or justified such a rule. Before Jack *v.* McKee, actions for breach of parol contracts had often been brought, and the damages had been regulated by the circumstances of each case, generally, by the price paid, or services rendered; never in a single instance, that I have found, by the value of the land. And had the mind of the Chief Justice been drawn to the subject, as the *principal* point, in Bash *v.* Bash, it would most certainly have recurred to the antecedent course of decision, instead of resting on the ill-supported and novel rule of Judge ROGERS, in Jack *v.* McKee.

Such are the two cases of 1848. Dismissing Bash *v.* Bash, as containing nothing relative to the point in question, more than

an unnecessary recognition of it, I recur to an examination of the doctrine, as held by Judge ROGERS in Jack v. McKee. He quotes the point which had been put to the court below by counsel, and which, when we come to state the authorities, will be found to contain the very mind of the law—"that the plaintiff was entitled only to such damages, as would be a reasonable compensation for the services rendered;" but he quotes it only to repudiate it, and to say, that "she was entitled to compensation according to the estimate of the parties themselves, or, in other words, to damages to the amount of the value of the land."

This opinion is said to rest on principle and authority. For the principle, the learned judge relies on a supposititious case stated by himself, in delivering the opinion of the court, in Rohr v. Kindt, 3 *W. & S.* 563, thus : " Where A., in consideration that B. will perform certain services of an uncertain value, agrees to give him a horse, or a tract of land, particularly named and specified ; B. performs his part of the contract, and then A. refuses to deliver the horse or convey the land ; the measure of the damages is the value of the horse or land, as the case may be, because that is the stipulated reward of the services of B., whatever may be their intrinsic value, more or less."

We have now got at the foundation of Judge ROGERS's rule for the measure of damages in actions on parol contracts, and with all respect for my learned predecessor, I propose to examine it candidly, but freely ; and that my observations on it may be more intelligible, I shall classify them.

1. It appears to me, that his hypothetical case was a mere *dictum*, and wholly irrelevant to the case before him. He seems to have suspected this himself, from what he says about it in Jack v. McKee. And whoever will examine Rohr v. Kindt, will see that it was an action of *covenant, on a written and sealed instrument ;* and that Judge ROGERS reversed the judge below, for saying, among other things, *that the value of the land was the measure of damages.*

2. It does not appear, from his own statement of his hypothesis, that the contract between A. and B. was a *parol* contract, and being stated in a case which was founded on a written contract, the fair presumption is, that he did not mean to state a case of parol contract ; and if he did not, it was inapplicable to Jack v. McKee, which proceeded on nothing but a parol contract.

3. The analogy between the horse and the land is delusive. The one is personal property, which passes by delivery, and perishes with the using ; the other, real estate, which grows more valuable with time, and which requires something more than delivery of possession to pass the title. From the time that Jeremiah bought the field of Hanameel, " and subscribed the evidence

[Hertzog *v.* Hertzog's Administrator.]

and sealed it, and took witnesses, and weighed him the money in the balances," (Jer. xxxii. 10), down through the whole Jewish history, through polished Greece and Rome, and among the barbarians of the North, the Goths, the Swedes, the Saxons—nay, among all nations, at all times, wherever property has been claimed and transferred in land, some solemnities have been observed, more than were necessary in bargains about personalty. It has been a writing, a shoe plucked off, a clod, a turf, a staff, or some visible memorial of the transaction, that was deemed necessary to solemnize a contract about land. With us, statutes prescribe deeds, seals, acknowledgments, and registries, as evidence of land contracts; and an ancient statute, borrowed from England, the Statute of Frauds and Perjuries, *which is the panoply of every land-owner in Pennsylvania,* sets aside and avoids all contracts about land, for more than a three years' lease, which are not reduced to writing. Now, notwithstanding all this, Judge ROGERS puts a contract about land, on a footing with a contract about a horse, and then refers to this incongruous conjunction, as the *principle* on which the ruling in Jack *v.* McKee was grounded.

4. By the "value of the land," Judge ROGERS does not mean the value at the time of the making the contract, but at the time of its breach. This is evident, from the manner of applying the rule in Jack *v.* McKee, and subsequent cases. If the value at the time of making the contract were intended, the consideration paid would be, as between the parties, the measure of *that* value, and this is the very standard of damages for which I contend. But the value at time of breach, is what Judge ROGERS sets up as the standard, "because that is the stipulated reward of the services of B., whatever may be their intrinsic value more or less." As to the expression, "certain services of uncertain value," we must be careful that we are not cheated by sounds. It is the constant business of juries, to ascertain and assess the value of services, whose price is not fixed, and certainly not a more delicate duty, than to ascertain and assess the value of land.

5. Without combating the rule of Judge ROGERS, in its application to horses and other personal property, I deny it to be law, as to land, either in England, in Pennsylvania, or in most of the states of this Union. An examination of the authorities will establish, beyond cavil, the following propositions: That in actions on *covenants of seisin,* the measure of damages is the real consideration paid. That mentioned in the deed is *primâ facie* evidence of the value of the land, as agreed on between the parties, and of the consideration paid; but the vendee is not concluded by the consideration mentioned in the deed, and may go into parol evidence to show what it really was. And when it is

[Hertzog v. Hertzog's Administrator.]

ascertained, it is sometimes called the value of the land, by which is always meant, the value at time of contract—for so it was agreed between the parties—but that consideration, or that value (whichever expression is preferred), is the measure, instead of the value at the time of the breach.   On covenants for *quiet enjoyment, and of warranty*, the measure of damages is limited by the consideration-money and interest, and this is said by Mr. Rawle, in his excellent work on *Covenants for Title*, p. 268, to be settled law in the states of New York, New Jersey, Pennsylvania, Virginia, North and South. Carolina, Georgia, Kentucky, Ohio, Arkansas, and Iowa.   In New Hampshire and Indiana, the question is said to be unsettled.   In several other states, it seems not to have been touched.   In Connecticut, Vermont, and Maine, the rule is to ascertain damages by the value of the land at the time of the eviction; though in Horsford v. Wright, *Kirby R.* 3, the leading case in Connecticut, LAW, C. J., admitted the British rule to be the consideration of the deed.   In Massachusetts, there are authorities both ways, though the weight of them inclines to the rule as held in Connecticut.   See the cases cited in *Rawle on Covenants for Title*, pp. 70–79, and 263–270.

Such is the rule, where the consideration is executed; and that it is the same where it is executory, follows, not only from the reasons of the law, but from the doctrine of the following cases: Flureau v. Thornhill, 2 *W. Black.* 1078 ; Walker v. Constable, 1 *Bos. & Pul.* 306 ; Johnson v. Johnson, 3 *Bos. & Pul.* 162 ; Walker v. Moore, 10 *Barn. & Cress.* 416 ; Jermain v. Egglestone, 5 *Carr. & Payne* 172.   On the authority of these cases, and others, Sir Edward Sugden, in his work on Vendors, and Mr. Chitty, in his work on Contracts, assert the rule to be, that if the purchaser declare on the common money counts, he of course cannot obtain any damages for the loss of his bargain; and even if he affirm the agreement, by bringing an action for non-performance of it, he *will obtain nominal damages only for the loss of his bargain ; because a purchaser is not entitled to any compensation for the fancied goodness of his bargain, which he may suppose he has lost, where the vendor is, without fraud, incapable of making a title: Sugden on Vendors* 280.   To the same effect, see *Chitty on Contracts*, p. 278, where the rule is very explicitly stated. Indemnity is the object of the action in these cases, and accordingly, it was held by TOD, J., in Seitzinger v. Weaver, 1 *Rawle* 377, that the damages on an article of agreement for the sale of land, where the vendor died without making a conveyance, was the purchase-money of the land, with interest from the time of the eviction.   If a purchaser take a deed without covenant, and he be evicted, he cannot recover back the purchase-money if it have been paid, though he may detain it, on the ground of failure of

428 SUPREME COURT [*Pittsburgh*

[Hertzog v. Hertzog's Administrator.]

consideration, if it have not been paid. But, neither with nor without a covenant, can he be compensated for improvements made, or for incidental accretions in value: Dorsey v. Jackman, 1 *S. & R.* 42; Stark v. Ten Eyck, 3 *Caines* 111; Pitcher v. Livingston, 4 *Johns.* 1; Bender v. Fromberger, 4 *Dall.* 436; Hayden v. Mentzer, 10 *S. & R.* 329; Bolton v. Johns, 5 *Barr* 145. The exception to these rules is in cases of fraud, which are everywhere recognised as furnishing a different standard: King v. Pyle, 8 *S. & R.* 166; Lee v. Dean, 3 *Wh.* 330; 2 *Wend.* 399; 21 *Id.* 457. But the question before me has no such element in it; for in neither Jack v. McKee, nor its cognates, was there an allegation of fraud.

These are the settled principles of law in regard to *written* contracts, and it is apparent that Judge ROGERS's hypothesis, in Rohr v. Kindt, unsupported by a single authority cited, is in direct conflict with these principles. Be it, that the man who contracts for a horse, and pays the price, may recover his value— the law of Pennsylvania is, as the cases cited will abundantly prove to any person who will consult them, that the man who contracts for *land*, and pays the price, but loses it, without fraud in the vendor, can, at most, only recover back his money and interest, or the value of his services rendered, if this was the form in which the consideration was paid.

But, perhaps, it will be said, the hypothesis in Rohr v. Kindt was predicated of parol bargains. Though this does not appear, yet let it be granted—what then? Do parol contracts for land rest on higher principles than written? According to the hypothesis, they do, and that is enough to condemn it. Let me illustrate. A. and B. buy each a tract of land the same day—the one in consideration of certain services of uncertain value already rendered, the other in consideration of similar services to be rendered. A. takes a deed, with nominal consideration, but with a covenant of warranty, and goes into possession, and makes valuable improvements. B. leaves his contract in parol, gets no possession, and makes no improvements. Ten years elapse, and the discovery of minerals on both tracts, and the improvement of the country, have greatly enhanced the value of both tracts; when A. has his land taken away by a paramount title, and B. fails to get his title: both sue for damages—A. for a breach of his covenant, B. for breach of the parol agreement. We have seen that the measure of damages in A.'s case, is not the value of the land at the time of eviction, *but the consideration paid*, which may be ascertained, not merely from the deed, but from evidence *dehors* the deed; "the uncertain value of the certain services" rendered, is the fact to be ascertained by a jury, and *that* value, with interest from the time of eviction, is the measure of his damages.

[Hertzog *v.* Hertzog's Administrator.]

But not so in B.'s case, according to Judge ROGERS. Here the jury are to ascertain the *value of the land at the time the contract was broken,* and to give damages to its full amount. Why? "Because the land was the stipulated reward of the services." But was not the land conveyed to A. as the *stipulated reward of the same services?* Exactly. And yet, according to the principle avouched by Judge ROGERS, A.'s folly in taking the title-deed is punished by his recovering, perhaps, one-tenth of the sum awarded to B., though the services rendered by A. were of equal value with B.'s, and his land lost possibly the most valuable, by reason of his improvements added.

Now, I ask, is that worthy the name of a *principle,* which, in this fairly stated case, would work such flagrant injustice, and so gross an absurdity? A bounty set on *parol* contracts for land in a state where the Statute of Frauds and Perjuries forbids them— where the Statute of Wills forbids parol disposition of real estate, —where warrants and surveys, patents and deeds, are the prescribed muniments of title—where seals and witnesses and registries are enjoined?

The plain truth is, that this so-called principle is so subversive of all received opinions—of all rights of property—so terrible an instrument of fraud and perjury—so opposed to the authorities and analogies of the law—that it cannot last. The judiciary is incompetent to make such a noxious weed grow in the soil of Pennsylvania, and under the broad light of the nineteenth century, cultivate it as they may. I predict, it will not long cumber the ground. When it comes to be generally understood and *felt,* a power greater than the hands which planted or nourish it, will uproot and throw it away. Meantime, however, much individual wrong and suffering will be inflicted by it, but this must be borne. I have seen some already. For whatever more it is destined to bring on families, before it is cast out, I do not mean to be in any manner or degree responsible. Hence, I have dissented from the majority, in every instance in which they have followed Jack *v.* McKee; and I am happy to be able, and at liberty to add, that my brother LOWRIE has joined me heartily in those dissents.

I come now to an examination of the *authorities* relied on by Judge ROGERS, in Jack *v.* McKee. They are Burlingame *v.* Burlingame, 7 *Cowen* 92, and Hopkins *v.* Lee, 6 *Wheat.* 118; but before discussing them, I propose to state the law, with all possible brevity, as it was always held in Pennsylvania before 1848, and to cite *our own* authorities, which Judge ROGERS did not trouble himself to do.

The statute of 29 Car. 2, though passed in 1676, was not extended to this country. This statute, founded on the experienced fact that parol contracts about land were prolific of frauds

and perjuries, is entitled an act "for prevention of frauds and perjuries," and it forbids the creation of any estate or interest in land, by parol, greater than a three years' lease. The fourth section, among other things, provides that *no action* shall be brought on any contract for sale of lands, or any interest in or concerning them, unless the agreement, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith.

But though our ancestors did not bring this statute over with them, they did not long leave themselves destitute of its most material provisions. Our Act of 21st March 1772, supplied several sections of the English statute; but, by accident or design, the fourth section was omitted from our enactment, and never has been in force in Pennsylvania. The consequence is, that with us no legislative enactment has ever forbidden an action to recover *damages* for breach of a parol contract about lands, though the policy of discouraging such contracts has always prevailed, and courts have, in every instance, before the case under review, watched the damages narrowly, that they should not amount to virtual performance of the contract.

The first case was Bell *v.* Andrews, 4 *Dall.* 152. The action there was by the vendee, not to enforce the contract, or to give him the profit and benefit of it—this was forbidden by the statute —but to recover damages, that should restore him to his rights, as they were before the contract was made.

Ewing *v.* Tees, 1 *Binn.* 450, was an action by the vendor against the vendee, to recover the purchase-money on a written contract, signed by the defendant and the agent of the plaintiff. The agent's authority being by parol, the case was treated as an action for breach of a parol contract, and the plaintiff had a verdict, not for the amount or value of the contract, which was $6366.67, but for damages to the amount of $283.21. TILGHMAN, C. J., after taking the distinction between an action for damages for not performing a contract, and an action to enforce it, added : " The jury may give such damages as, under the circumstances of each case, appear reasonable, and *these damages will often be very small*, and there is less danger of perjury, because these actions are limited, so that they must be commenced within six years." In both these cases, the distinction is plainly marked, which, in our day, it has become fashionable to disregard, between damages as indemnity, and damages according to the value of the bargain.

That the understanding of the profession formerly was, that damages for the value of the land was equivalent to performance of the contract, and so within the statute, is apparent from the note in 1 *Smith's Laws*, p. 397. "If," says that very sensible annotator, "under the pressure of heavy damages, the party

could, in such cases, be deprived of what is called the *locus pœnitentiœ*, and on the one hand, be compelled to convey, or on the other, to accept of the purchase, by having damages against him *to the amount of the contract*, according as the jury may view the circumstances of the case, the distinction would then be without a difference, and the absence of the fourth section of the statute of Charles, a serious inconvenience."

In Irvine *v.* Bull, 4 *Watts* 287, it was decided, that specific performance of an unexecuted verbal bargain for the purchase and sale of land, could not be enforced by action; and that a conditional verdict, in an action on such a contract, for a certain sum, to be released on the execution and delivery of a deed, was erroneous.

George *v.* Bartoner, 7 *Watts* 530, was an action by the vendee, in which the amount of damages recovered is not stated; but from the remark of the court on the subject of damages, it is evident, they were not given as a penalty to enforce the contract. It was said, the action was in *disaffirmance* of the contract, and for that reason was sustained.

In Whitehead *v.* Carr, 5 *Watts* 368, the action was brought by two, on a contract of purchase made by one; and GRIER, P. J., ruled, that the action had not been rightly brought in the name of the two plaintiffs, *and that it could not have been maintained if it had, without proof of a part execution of the contract;* and his judgment was approved in an opinion by HUSTON, J., who intimates considerable doubt in what cases such actions will lie.

Wilson *v.* Clarke, 1 *W. & S.* 554, illustrates the law on this subject exactly. It was an action by a vendor, to recover purchase-money, and GIBSON, C. J., assuming that a vendee could not have the profits of a parol contract for land, argued from the necessary mutuality of contracts, that the vendor could not recover his purchase-money; but admitted, that either might have his action for damages, for breach of the contract by the other.

If the court had understood, at that time, that the vendee's measure of damages was the full value of the land, the Chief Justice would, most certainly, have made him pay the purchase-money, and Wilson *v.* Clarke must have gone the other way; for the case was put on mutuality—and if *one* might recover the value of the contract, then, by force of the principle of mutuality, the *other* might. But because the vendee could not have the value of the contract, the vendor should not.

Ellet *v.* Paxson, 2 *W. & S.* 418, was another action by the vendor, to recover damages for breach of a parol bargain, the consideration of which was $15,000. The plaintiff claimed damages to that amount; "but," said SERGEANT, J., at Nisi Prius, "I do not agree to this; to do this would be to subvert the Act of Assembly; you might as well repeal it." The jury found a

[Hertzog *v.* Hertzog's Administrator.]

verdict for $6500, which, when the case came before the Supreme Court, Judge KENNEDY pronounced " enormous, and altogether unreasonable," and said, that in no view of the case, ought they to have exceeded $5000. He recognised, also, the doctrine, that to allow the plaintiff to recover to the full amount of the value of his contract, would be virtual execution of it, in contravention of the statute. In Sedam *v.* Shaffer, 5 *W. & S.* 529, the rule of damages, as I have stated it, will be found distinctly recognised.

In accordance with this train of decisions, Hastings *v.* Eckley, 8 *Barr* 197, was decided; and if the precise point now before us was not passed on by the Supreme Court, it was because learned counsel acquiesced in the ruling it received below.

I conclude this glance at the law, as it stood before Jack *v.* McKee marred it, with the following words of Judge ROGERS, in Haines *v.* O'Conner, 10 *Watts* 320; and I adopt them as reflecting the very form and pressure of the law: " We must be careful to avoid unsettling titles to real estate, upon parol proof of bargains made a long time since, particularly where the property has greatly increased in value, or where it has passed into other hands. If the court should yield to such claims, it is impossible to foresee where the mischief will end, from the ease with which such testimony can be procured, tempted as they will be by the chances of receiving large estates on proof of such agreements. If a parol contract for the conveyance of land has been violated, the party has his remedy for action, when he will recover the damages *actually* sustained." Thus it is shown, that every judgment and judicial sentiment on record, prior to 1848, is in fatal antagonism to the ruling in Jack *v.* McKee.

Now for Burlingame *v.* Burlingame, 7 *Cowen* 92. This was an action on the common counts for labour and services. It appeared in evidence, that the defendant agreed with the plaintiff (an infant), to convey him a certain piece of land, if he served the defendant faithfully till 21 years of age. He worked till he was 21, and some time afterwards, when he instituted this suit. Three points of defence were taken: 1st. That plaintiff could not recover for his services during minority, the compensation for those belonging to his father. 2d. That this part of his claim being on a special agreement, was inadmissible under the common counts. 3d. That the agreement was void by the Statute of Frauds.

The Supreme Court of New York ruled the first against the defendant, and the second in his favour;—that is, that the plaintiff could not recover on the common counts, and this doctrine was afterwards overruled in King *v.* Brown, 2 *Hill* 485. As to the third point, the learned judge stated the question in these words: " The question, then, is presented, whether, in any given case, where one has parted with his money, or rendered services, and

[Hertzog v. Hertzog's Administrator.]

the consideration for so doing, is a promise by the other party to convey land, the party who has rendered the service or paid the money is without remedy ?" After reviewing the New York authorities, he answers this question thus: " It seems, therefore, to be clear, upon principles of law and justice, that the plaintiff may elect to consider the contract as rescinded; and if so, his right to recover back *his money, or compensation for his services,* is unquestionable."

This is precisely the doctrine of the point put by counsel in Jack *v.* McKee, and yet in overruling that point, Judge ROGERS cited *this* case as authority! Did the learned judge read the report of the case? I think it is impossible, for after a very careful analysis of it, I am prepared to say, that although no question was raised on the measure of damages, yet so far as it goes, Burlingame *v.* Burlingame is an authority *in-direct opposition* to the ruling in Jack *v.* McKee. So is King *v.* Brown. There, Chief Justice NELSON ruled, that these contracts are void under the statute, and then added: " The true principle is this, the contract being void and incapable of enforcement in a court of law, the party paying the money, or rendering the service, in pursuance thereof may treat it as a nullity, and *recover the money, or value of the services rendered, under the common counts.*" Accordingly, the judge below, who had ruled that the "*plaintiff was entitled to recover the value of the lands, at the time the defendant should have conveyed,*" was reversed. Judge ROGERS says that King *v.* Brown, so far from overruling Burlingame *v.* Burlingame, in this particular, affirms the principle as to the measure of damages, which is most true; for the two cases are coincident on *this* point, and both of them dead against the doctrine for which Judge ROGERS cited them. If I have not quoted enough from them to prove this, let any man study them for himself, and he will see I am right. There is a striking instance of the infectious nature of error, as well as of the *diligence* of a compiler, in Sedgwick's work on the Measure of Damages, where the author, a New York lawyer, instead of examining these cases in his own state, and giving us the rule they furnish, follows Judge ROGERS in grouping them with Jack *v.* McKee, and represents them as teaching the same doctrine.

The other case relied on as authority by Judge ROGERS, is Hopkins *v.* Lee, 6 *Wheat.* 109; where the Supreme Court of the United States, under the special circumstances of a very peculiar case, resting not in parol agreements, but in *written contracts,* applied the rule of that court, that in an action by the vendee for a breach of contract on the part of the vendor, for not delivering the article specified, the measure of damages is its price at the time of the breach; but intimated, that such was not the rule in case of

eviction.   To borrow the language of the printed argument of a distinguished gentleman of the bar, in Bash *v.* Bash, "it is sufficient to say in reference to that case, Hopkins *v.* Lee, that it is entitled to no weight, because it seems to have been decided without much consideration, and without any research, and is supported by no authority whatever.   It is to be remarked, however, that the court decline saying what the law would be in case of an eviction, that to be consistent, they must apply the same rule to contracts *executed*, and that on the contrary, the law is so well settled in the latter description of cases in this state, as to control, by the force of analogy, the decision in this case.   The same view of the case is taken by the Supreme Court of New York, in 2 *Wend.* 399; where it will be found to be overruled on the same ground."

Such are the authorities which Judge ROGERS invoked, when he turned his back upon all that had been settled in England and Pennsylvania, and in most of the other states of the Union, on the subject of damages for breach of real contracts.   Never was the maxim of *stare decisis* more signally violated, and never was violation of that maxim more inadequately palliated.   Under the influence of such just sentiments, as this learned judge had advanced in Haines *v.* O'Conner, the courts were returning to a strict construction of the Statute of Fraud and Perjuries; and specific execution of parol contracts for lands was beginning to be denied, in every case, where it would not be a fraud to withhold execution, and the owners of land in Pennsylvania seemed likely to regain the protection which that statute was designed to afford their titles; but, as soon as the doctrine in Jack *v.* McKee came to be understood, it was perceived how, under cover of compensation, this venerable rule of property could be evaded.   Instead of bringing actions of ejectment for recovery of the *land*, actions on the case for the recovery of the *value of the land*, came into fashion.

In Peifer *v.* Landis, 1 *Watts* 392, Judge ROGERS had held, that a contract in all points similar to that in Jack *v.* McKee, was within the statute, but that was ejectment, in the nature of a bill in equity for specific execution, and therefore the statute should apply; but had the plaintiff in that case, after Jack *v.* McKee was decided, sued for damages, the full value of the land might have been recovered, notwithstanding the statute, and thus the operation of that invaluable statute was brought down to the difference which exists between a tract of land and the full value of a tract of land.   Persons were not slow in conforming their demands to this imaginary distinction—a distinction, according to Smith's note, without a difference—and accordingly, we have had, in rapid succession, a series of extraordinary cases, which may

[Hertzog v. Hertzog's Administrator.]

fairly be regarded as fruits of Jack v. McKee, and which, as they are not yet reported, I proceed now to notice.

The first of them was McDowell v. Oyer,* at Harrisburg, in June 1853. It was an action against the personal representative of a decedent, and the proof of contract consisted in casual declarations of the decedent, made to various persons; sometimes importing that he meant to give the plaintiff, for services rendered, a house and lot known as the "Wyand property," and sometimes ten or twelve acres of land known as the "Troutman property." The plaintiff declared for both, and seems to have got a verdict for the value of both._ The evidence, less satisfactory to my mind than that which was repudiated in Bash v. Bash, was deemed "direct and positive" by _three members of this bench, and the judgment was accordingly affirmed. In the opinion delivered by Chief Justice BLACK, no additional authorities are cited, and no new views advanced in support of the ruling in Jack v. McKee; but there is a solemn and impressive exposition of the maxim of *stare decisis*, which it is much to be regretted was not before the mind of the court in 1848, for it might have prevented the decision that was made in Jack v. McKee. That case, as I have shown, was an abrupt departure from all that had gone before it, and deserved the chastisement which, while following it, the chief justice administered in McDowell v. Oyer, to all such departures. For myself, I take occasion to say, that when, through accident, press of business, or misconception, a decision is pronounced which subverts a fundamental rule of property, and by consequence renders every man's estate insecure—which, under colour of compensating personal services, strips families of their patrimonial acres—which, in short, subjects land-titles to the changes and chances of parol evidence—the maxim of *stare decisis* bids us to go back to the old, straight, safe paths, and not to blunder again and again, because we have blundered once.

The next case in the series was McClintock, Administrator of Beach, v. Beach, decided at Philadelphia, in March 1854, in which a grandson sued the administrator of his deceased grandfatherfor a bill of services, which, as rendered, amounted to about $1711, but which was subject to various set-offs. The case was arbitrated, and on examining the principal witness for the plaintiff, his counsel conceived that he could strike higher, and accordingly discontinued that suit, and instituted another for the value of the old man's homestead and one hundred acres of land, valued at about $10,000. On the trial of this cause, the evidence consisted of the usual declarations, importing testamentary intentions in favour of the grandson, and the rule in Jack v. McKee,

* Since reported in 9 *Harris* 417.

[Hertzog *v.* Hertzog's Administrator.]

endorsed by McDowell *v.* Oyer, being, as I have occasion to know, most reluctantly applied under the pressure of authority, by the learned president of the Common Pleas, the plaintiff had a verdict for $9695. Embarrassment certainly, and possibly ruin to the grandfather's estate—disappointment and poverty to widowed daughters and their children, and confusion and distress throughout the family of Nathan Beach—are the consequences. Painful as they are, I agree that these circumstances are no reason for changing a well-considered and long-settled rule of law; but they plead powerfully against this modern and destructive innovation upon well-considered and long-settled rules. Who does not see, that exact justice would have been done to young Beach, by giving him the amount of his claim, lessened by his grandfather's advances? He would, doubtless, never have thought of more, if Jack *v.* McKee had not put mischief into his head; and thus it is, that a bad precedent makes hard cases, as hard cases often make bad precedents.

I come now to the case in hand. An old maiden lady, Becky Malaun, having real and personal estate, took a young girl to bring up, who was friendless and destitute. She clothed and schooled her—gave her, from time to time, various articles of personal property—suffered her to marry, after which she and her husband lived in the old lady's house—the wife having control of the old lady's purse, and, during the last year of her life, receiving various sums of money. After Becky's death, Mrs. Ammon claimed $300 of the personal property as her own, which was set off to her, and then she instituted this action to recover the value of all that remained, both real and personal, on the strength of certain declarations which the old lady had been heard to make; and under the direction of the court, the jury gave the value of the property, $1843.47. Looking into the evidence, it seems to have been of about the usual stamp—expressions of affection and confidence, and indicative of testamentary intentions. The witnesses were a brother of the plaintiff, who obtained his most important revelations from this old woman, over seventy years of age, "in the evening, at supper, while we were sitting at the table, taking tea," and neighbours, who heard casual observations, from time to time, as opportunity served. Some attempt was made to establish a nuncupative will for the old lady; but that failing, on account of the rigour of our Statute of Wills, this action was resorted to with complete success. Garrulity is one of the privileges of old age, especially over the tea-table; but if this modern rule of law prevails, it must be denied to old people, and they must be taught that *chit-chat* has become title in Pennsylvania; though even then, if they seal their lips hermetically, they must not be sure words will not be imputed to them which will transfer all they leave to stranger-hands. If

[Hertzog *v.* Hertzog's Administrator.]

twelve men could be found, who, on the facts in this case, should not believe the plaintiff had been richly compensated for all she did for the decedent, let them give what would compensate her. That, according to my views of right and wrong, would be justice; and according to all that was written before Jack *v.* McKee, it would be law too. But to compensate her, without reference to the value of her services, and according to the value of the property promised—not as its value was when the promise was made, but when it was broken—is, in my humble opinion, opposed to law, reason and justice.

It is worthy of remark, that Jack *v.* McKee, and each of its sequents, have been against personal representatives of decedents. Who does not know how easy it is to fabricate cases against dead men? They are not here to explain, to contradict, and to hold willing witnesses to their responsibility to the criminal law; and hence, persons are never wanting, to swear strongly in behalf of a living relative or friend. The prominent thought, expressed in some loose and casual conversation, may be substantially stated, though generally with high colouring; but all the conditions and qualifications which the speaker annexed to the thought, are sure to be forgotten by the witness. These inaccuracies, resulting necessarily out of the infirmities of memory, and the bias and corruptibility of witnesses, and inherent, more or less, in all parol testimony, are what render it unfit to be evidence of title or interest in land. Hence society has provided itself with legislative guards, against the manifold dangers of parol proof in reference to lands, in the Statutes of Frauds, and of Wills. The first requires contracts about land, if more is meant than a three years' lease, to be in writing; the other, that all wills shall be written, signed, and attested by two witnesses; and although it provides, very cautiously, for noncupative wills in respect to *personalty*, it tolerates nothing in respect to *realty*, except written and attested instruments. The legislature has provided for proof and specific execution of parol contracts of decedents, for land, *where the parties have so far in part executed them, as to take them out of the Statute of Frauds and Perjuries*—a plain intimation that where they have not been in part executed, there is no remedy for them, either specific or substantial. Now, neither in Jack *v.* McKee, nor in the cases which have followed in its wake, was there any pretence of such part execution of the contracts alleged, as would take them out of the statute; and therefore, it has happened, that in giving damages to the full value of the contracts, and thus executing them substantially, not only all precedent judicial opinion has been contravened, but the legislative policy of the state has been violated. In each of these cases, the contract has been such as the law would not allow to be enforced—which equity, even, would not rescue from the condemnation of

[Hertzog *v.* Hertzog's Administrator.]

the statutes alluded to ; and yet we are told, the law will punish
the breach of it, where there has been no fraud, with a measure
of damages equivalent to specific performance !

The rule that requires claims to land, or its equivalent value, to
be written, is plain, simple, reasonable and just.   If the contract
set up to take away another's inheritance will not bear to be
written, that is, if the party could not be brought to the point of
signature, as in the case under review, the decedent most cer-
tainly could never have been brought ; then, that is proof positive,
that such a contract was never finally settled and made ; and no
amount of loose and incidental talk, or looser recollections and
representations of it, ought to prevail against the powerful pre-
sumption that arises from the absence of written evidence.

But the great argument in these cases has been, that nothing
could make the plaintiffs whole but the value of the land ; that
the value of the land is the value of the services, as fixed by the
parties themselves, and that such parties, like all others, are to
be held to their contracts.   Perhaps, this argument is sufficiently
answered in what has been already advanced, but I reply to it on
two specific grounds.

If the contract be indeed such, that the value of the land must
be the measure of damages, then that proves it to be within the
Statute of Frauds, and it must be set aside.   To such a contract
the parties are not to be holden, any more than to promises barred
by the Statute of Limitations, or to contracts made in violation
of the statutes against Sabbath breaking, usury, or indictable
crimes and misdemeanors.   Such a contract is just as much within
the reason of the statute, when its fruits are sought in an action
of *assumpsit*, as in an action of ejectment.   The operation of the
statute cannot, logically or fairly, be made to depend on the nature
of the action brought on the contract.   The statute is a rule of
evidence, intended to prevent perjuries, to which contracts for
land are supposed to offer peculiar temptations, and if fairly dealt
by, must be so construed as to suppress that mischief.   The mis-
chief sprung from parol proof of land contracts, and whatever
the form of action, the policy of the statute was, to exclude this
medium of proof, " for the prevention of perjuries."   Now, it
would require nice casuistry, to determine how much less tempta-
tion to fraud and perjury the *value* of a tract of land would offer,
than the *tract* itself.   It is the value of land, that constitutes the
motive to contracts, actions, and perjuries about it ; strip land
of all value, and it will not be the subject of contracts.   And
land and its value are equivalents ; every acre in Pennsylvania
has its equivalent in some denominate sum of money.   Judge
Rogers conjectured that Miss McKee would prefer Jack's land
to its value in moneys numbered, because " it had been the home
of her fathers ;" but most people are not so sentimental as Miss

McKee, and would quite as soon have land's worth in cash, as the land itself. The argument concedes, that the contract is within the statute, when you go for the land, but denies that it is, when you go for the value of the land; that is, the statute, according to the argument, was made for "prevention of perjuries" in *eject-ment*, but not in actions *on the case*, though the contract sued on and to be proved in both actions is identically the same. Such a distinction would seem like trifling with rules of property and legal principles, if judicial sanction, again and again, had not given it the dignity and force of law.

But, in the next place, I answer the argument by saying, that it is a gratuitous assumption, that nothing but the value of the land would make the plaintiffs in these actions whole. The law is under no obligation to make such parties whole, no more than it is to make a usurer whole: for their contracts, like his, are con-traband; but, in its clemency, the law does indemnify both. It allows a man, on a usurious contract, to recover his actual dues, and it gives parties to parol contracts for land, compensation for their moneys paid, or their services rendered. This is indem-nity; this makes them whole. Would not Ann McKee and Mrs. Ammon have been made whole by a reasonable allowance for such services, as their deceased benefactors had not already com-pensated? If it be said, that nothing but the value of the land promised could compensate their services, and those of the plain-tiff in McDowell *v.* Oyer, will it not be admitted, that in Beach's case, he would have been made whole by a measure of damages, that should have been limited to the *amount of his own attested account rendered against his grandfather's estate?* Was it, indeed, necessary, that he should have a verdict for some seven or eight thousand dollars more than he claimed to be due him, in order that Judge ROGERS's principle in Rohr *v.* Kindt should be vindi-cated? That *principle* has cost the heirs of old Nathan Beach dearly. After the affirmance of the judgment, they offered the plaintiff the land for the value of which he had sued; but he declined to take it, in satisfaction of his judgment, and I under-stand, it is expected to sell, at public sale, not only that land, but as much more, to raise the means for making him *whole*, according to this modern rule. I state this fact on unquestion-able authority, and for the purpose merely of illustrating the practical working of a legal principle, the soundness of which is extensively doubted, and which, though abundantly sanctioned by recent judicial authorities, is not according to the course of the common law, nor, as I humbly conceive, conducive to the safety and welfare of society. I insist that, in all of these cases, the actions should have been treated as in disaffirmance of the respec-tive contracts, and indemnity is all that can legitimately come out of such actions; but if the action be not in disaffirmance, but

for breach of the contract, the rule of damages cited from *Sugden* applies, which is decisive against damages, according to the value of the bargain. The moment you go for the profits of the contract, for the land or its equivalent in money, you affirm the contract, and demand its virtual performance, and that brings it within the Statute of Frauds.

These are the views, very imperfectly sketched, which have compelled my brother Lowrie and myself to dissent from a course of decision, which, although sanctioned by the two precedents of 1848, and supported by the learning and ability with which it is our honour to be associated, has, in effect, *placed the value of all the real estate in Pennsylvania at the mercy of parol evidence, in its most unsatisfactory and dangerous form.*