Bemis et ux. *v.* Van Pelt, Exr., et al., Appellants.

Argued October 27, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

284

*Samuel G. Wagner,* with him *Dorothea M. Wagner,* of *Wagner & Wagner* and *Arthur B. McBride,* for appellants.

*John E. Evans, Sr.,* of *Margiotti, Pugliese, Evans & Buckley,* for appellees.

OPINION BY RHODES, J., March 2, 1940:

Plaintiffs brought this action against the executor of the last will and testament of decedent to recover damages for the breach of an oral contract whereby they were to render personal services to decedent, and he was to compensate them by leaving them real and personal property in his will. Prior to the trial the heirs and devisees of decedent were joined as additional defendants. Following a verdict for plaintiffs, defendants' motions for judgment in their favor n. o. v. and for a new trial were refused, whereupon they took this appeal.

There are twenty assignments of error, several of them being duplications (9 and 16; 10 and 17; 11 and 18; 12 and 19; 15 and 20). All of them except two (15 and 20), which relate to the form of the verdict and judgment, fall into two groups, one consisting of those which question the sufficiency of the evidence, and the other of those which complain of errors in the charge of the court.

It appears that decedent owned two houses which were upon the same lot of ground. Decedent lived in the larger of the two and appellees in the smaller, prior to 1930. In 1929 there was a fire in the smaller house,

and for several months appellees lived in decedent's house. Then, after the smaller house was repaired, they returned to it, but in the fall of 1930 moved again to decedent's house, where they remained until his death on August 19, 1935. His will was dated May 8, 1930. Appellees were not related to decedent, and he had no relatives here to look after him.

In the statement of claim appellees averred that since 1927 decedent had been ill, and that in October, 1930, decedent proposed to the said appellees that if they would take care of decedent "during the balance of his life, preparing his meals, doing his house work and caring for and assisting [him] [he] would at the time of his death, in consideration thereof, give to [appellees] all of his real estate located at 523 Centennial Avenue, Sewickley, Pennsylvania, which include[s] the large and small house thereon; and also, that he would give them some money besides." It was also averred that appellees accepted this proposition, and, beginning October 25, 1930, performed all of the duties required of them thereunder until the time of decedent's death; that decedent, prior to his death, executed his last will and testament "but in violation of the said contract did not give to [appellees] the premises at No. 523 Centennial Avenue, as he had agreed to do," but "did devise and bequeath to [appellees] only a part of said premises, namely, a part of the lot in the rear and the small house located thereon"; "that the fair value of the services so rendered by [appellees] to [decedent] in his lifetime under said agreement" was the sum of $8,750; that the fair market value of the real estate given to appellees under the will did not exceed $2,000, which appellees applied as a credit on the amount alleged to be due them. Several witnesses, all of whom appear to have been disinterested, testified for appellees in support of these averments. Appellants offered no testimony.

Considering the nature of this case and the questions

involved, we are disposed to give in considerable detail the testimony which was presented. Benjamin T. Holman, who had known appellees and decedent for over thirty years, testified that at the time of his death in 1935, decedent was between eighty-five and eighty-six years of age; that during "the last seven or eight years his health was very poor. Numerous times he could not take care of himself at all"; that in the fall of 1930 decedent was ill, and wife appellee was taking care of him in the daytime, and husband appellee at night. He was asked to relate a conversation which he had with decedent about that time relative to appellees, and what decedent wanted them to do. The reply was: "A. He wanted Mr. and Mrs. Bemis to come back to the large house and stay with him and take care of him. He said that Elizabeth—he always called her Elizabeth; he said either Elizabeth or Mother—he said that Elizabeth had too much to do to take care of both houses and a sick man and if they would come back—he said that in the presence of Mr. Clark Bemis—if they would come there and would take care of him he would give them all he had. He had no friends in this country, he said. Q. Do you know whether or not Mr. and Mrs. Bemis did go up to the large house where Mr. Milliner was? A. They did. Q. Did they take care of him there? A. They did. Q. Do you know how long they continued to take care of him? A. Up until his death." He also testified to statements made by decedent thereafter, such as on one occasion when, in the presence of decedent, the witness told appellees that they were foolish to spend any money on the property, and decedent said, "Why not, I can enjoy it while I am here and Clark and Elizabeth will have it when I am gone." At another time decedent remarked to the witness that husband appellee was taking down all the old chandeliers and putting up new ones. The witness replied that he did not think he would spend that money, whereupon

decedent said, "Well, I can enjoy it while I am here and they will have it when I am gone. Go ahead and let him fix the place up when he wants to." The witness testified that in the fall of 1932, when decedent "had a very bad spell" the witness said to decedent, 'You are lucky to have a woman like that here," and decedent said, "She will be paid well for it; everything I got will go to Clark and her but I don't have enough."

Mrs. Elizabeth Sturgis testified on one occasion she said to decedent, "You will never pay Mrs. Bemis for what she is doing for you." Decedent replied, "Yes, I will; when I am gone all this is hers." The date of this conversation does not appear.

Mrs. Helen Ifft testified that in the summer of 1931, in the course of a conversation with decedent, she remarked how fortunate he was to have a couple like Mr. and Mrs. Bemis to take care of him in his old days, and he said, "I don't know what I would have done if I hadn't have them, I don't know what I would have done without them ...... I will not forget them ...... What I have, when I am gone will be theirs."

Mrs. Mary C. Holman, wife of the previous witness, testified that at one time when she was visiting decedent she remarked to wife appellee that they were foolish for having done certain painting in the house, whereupon decedent remarked that "some day this will be all her own," and that on another occasion, about the time when appellees were moving back to the little house which was apparently after the fire, decedent said, "I don't want her to go back there, I want her to stay here because this will be her home when I am gone."

It appears that appellees returned to decedent's home in February, 1931.

Dr. E. S. Henry testified that between October 30, 1930, and November 23, 1930, he made fourteen visits to decedent; between February 23, 1931, and May 13, 1931, eighteen visits; between June 14, 1932, and July

12, 1932, nine visits; between November 26, 1932, and December 19, 1932, ten visits; one visit on January 14, 1933; none in 1934; and between August 15, 1935, and August 19, 1935, when decedent died, ten visits.

It is clear from the testimony of all these witnesses that throughout the period in question wife appellee performed satisfactorily and faithfully all the household duties, as well as taking care of decedent when he was ill. His infirmities rendered many of these tasks most disagreeable and unpleasant.

Mrs. Margaret Faust, a practical nurse, testified that a fair weekly compensation for the services rendered by wife appellee was $35 to $40 per week, and Dr. Henry expressed the same opinion.

This summation of the testimony is sufficient to in-dicate that enough has been produced to justify its submission to the jury for the determination of the existence of the contract (*Kauss v. Rohner, Adm'r*, 172 Pa. 481, 33 A. 1016); and as decedent failed to reimburse appellees in his will, in accordance with the alleged agreement, appellees properly brought this action for the reasonable value of the services of which there was likewise evidence for the jury's consideration (*Schoenbachler's Estate*, 310 Pa. 396, 165 A. 505). The rule which we think to be applicable is that the measure of damages for breach of an agreement to will property in consideration of services to be rendered is the value of the services performed on the faith of the contract, and not the value of the real and personal property promised,[1] but, if the contract or agreement between the parties was that the services so rendered

---

[1] *Hertzog v. Hertzog's Adm'r*, 34 Pa. 418; *Graham v. Graham's Ex'rs*, 34 Pa. 475; *Pollock v. Ray*, 85 Pa. 428; *Kauss v. Rohner, Adm'r*, 172 Pa. 481, 33 A. 1016; *Snyder v. McGill, Adm'r*, 265 Pa. 122, 108 A. 410; *Breniman v. Breniman et al., Ex'rs*, 281 Pa. 304, 126 A. 751; *Conkle v. Byers' Ex'r*, 282 Pa. 375, 127 A. 848; *Schoenbachler's Estate*, 310 Pa. 396, 165 A. 505; *Byrne's Estate*, 122 Pa. Superior Ct. 413, 186 A. 187.

the decedent at his request should be compensated for by a money legacy definite in amount, or capable of being ascertained, that sum may be recovered if the decedent fails to provide for the legacy agreed upon (*Estate of Rachel Nusbaum, Dec'd,* 101 Pa. Superior Ct. 17).

We recognize that the reports disclose unmistakable judicial antipathy to this kind of claim, but we think the testimony, if believed by the jury, was sufficient to meet the requirements as to the quality of proof as laid down in *Mooney's Estate,* 328 Pa. 273, 194 A. 893.

The difficulty with the record before us is that we cannot ascertain whether the jury found that there was an express agreement between decedent and appellees to pay for the services as pleaded, or that the services were rendered without request, and with no promise to pay. The jury may have found that the services were rendered, and that no express agreement to pay existed. Appellees in the instant case, as in *Witten v. Stout, Ex'r,* 284 Pa. 410, 131 A. 360, averred an express contract to give them specified compensation, to wit, certain real estate and some money besides; and at the same time they properly claimed the value of their services.

They could not recover the value of the real estate which had been agreed to be given by the oral promise, and the money to be given was indefinite and not ascertainable. *Graham v. Graham's Ex'rs,* 34 Pa. 475. See *Hertzog v. Hertzog's Adm'r,* 34 Pa. 418. Proof of the agreement and of the value of the services rendered would sustain a jury's verdict for appellees.

But, as said in *Witten v. Stout, Ex'r,* supra, at page 412: "Unless, by amendment or otherwise, there is a clear averment in the statement of claim showing a plain intention to plant plaintiff's case on a pure quantum meruit basis, the rule (correctly set forth by Judge LANDIS in *Wolf v. Yeager's Exrs.,* 20 Lancaster

L. Rev. 67) controls, that, where one claims on an express contract to pay a fixed compensation, he cannot, on failure to prove the contract, entitle himself to recover by proving simply the value of services rendered, without showing an actual promise to pay."

The trial judge in his charge substantially stated the basis upon which appellees were entitled to recover, if at all, when he said: "Your next inquiry will be under that contract, if you find a contract to have been made, to determine what the services rendered were worth, and after you have determined from the evidence in the case what the services were and what the services would be reasonably worth that were rendered by these plaintiffs . . . . . ." See *Kauss v. Rohner, Adm'r,* supra, p. 488. But the trial judge erred and may have misled the jury in that part of the charge which followed (eighteenth assignment of error) : "If you are not convinced by the weight of the credible evidence in the case that this contract was made as the plaintiffs allege that it was made, you then come to another phase of this case, another inquiry. If you are convinced by the weight of the testimony that Mr. and Mrs. Bemis rendered the service for a period of four or five years to Mr. Milliner that the witnesses say that they rendered, even if you do not find that the contract was made, if you find that the services were rendered, they are not of kin to Mr. Milliner and where services are rendered by one person to another and family relations do not exist and they are not of kin, the law steps in and implies a contract or an agreement to pay for those services, but while the law implies a contract to pay for those services on proof that the services were rendered, the law also raises a presumption that where services were rendered over a period of years, that they were paid for as rendered. That rule of the law applies only to a domestic, to persons who are employed as domestics in a home, and if you are convinced by the evidence in this case that the relationship of Mr. Milliner and Mrs.

Bemis in this case was that simply of a householder and a domestic servant, then that rule of law would be applied for in weekly or monthly payments as is frequently the rule covering domestic service ...... So even if you should not be convinced that this contract was made, but was convinced that these services were rendered by Mr. and Mrs. Bemis, and particularly Mrs. Bemis, in the absence of any express agreement on the part of the deceased to compensate them for that, you will still find a verdict in favor of the plaintiffs, and that verdict would be arrived at and be measured in the same way as the other verdict, provided you are convinced that the services were rendered and that the services were not paid for periodically as the Court has outlined it to you."

The services rendered by appellees as averred in the statement of claim, and as shown by the testimony, consisted of taking care of decedent, preparing his meals, and doing his housework. From the standpoint of the nature of the services rendered by appellees, the presumption of payment applied. *Gilbraith's Estate*, 270 Pa. 288, 113 A. 361; *Witten v. Stout, Ex'r*, supra; *Mooney's Estate*, supra; *Collins' Estate*, 83 Pa. Superior Ct. 31. The jury should have been so charged. Domestic labor and nursing are customarily compensated for at stated intervals, as rendered, and, when a claim of the nature of appellees is presented, there is a strong presumption that the services were so paid for. *Witten v. Stout, Ex'r*, supra, p. 413. In *Mooney's Estate*, supra, the services rendered to decedent were as nurse, dressmaker, business adviser, and companion, and it was held that there was a presumption that such services were paid for from time to time while they continued. The twelfth, thirteenth, and nineteenth assignments of error complain of the charge of the court as to the law on the presumption of periodic payments. These assignments of error are sustained. The testimony was suffi-

cient to overcome this presumption if the jury believed that the testimony established the contract as pleaded. The alleged contract provided for payment at the death of decedent, and hence in that event no presumption of periodic payments would arise (*Conkle v. Byers' Ex'r,* 282 Pa. 375, 378, 127 A. 848); but the rebuttal of the presumption might be said to depend upon the accepted existence of the contract. In the Conkle case (at p. 378) the Supreme Court said: "As the contract here provided for payment at the death of Miss Byers, no presumption of periodic payments arose, nor was any part of plaintiff's claim barred by the statute of limitations: *Kauss v. Rohner* [*Adm'r*], 172 Pa. 481 [33 A. 1016]."

The eighteenth assignment of error is also sustained, as the charge sets up an erroneous basis for the jury's findings under the pleadings and the facts as we have hereinbefore pointed out.

The remaining assignments involve no reversible error, and require no comment.

In the instant case there is no personal liability on the heirs, although they may have been joined as parties for the purpose of notice. A judgment if subsequently obtained should be limited to the executor of the last will and testament of the decedent.

The judgment is reversed, with a venire.